**UNITED STATES of America,
Appellant,**

v.

**Laura Jane WHITEHORN, a/k/a Ann Morrison; Joann Roth; Milagros H. Matese; Sharon Lee Scott; Leslie Harris; Jane Bornter; Patsy McCarthy, Appellee. (Two Cases)**

Nos. 86–5524(L), 86–5546.

United States Court of Appeals,
Fourth Circuit.

Argued Nov. 14, 1986.

Decided March 12, 1987.
Rehearing and Rehearing En Banc
Denied April 15, 1987.[*]

---

* McMillan, District Judge, dissenting.

John Granville Douglass, Asst. U.S. Atty. (Breckinridge L. Willcox, U.S. Atty., Baltimore, Md., on brief), for appellant.

John Kenneth Zwerling (Michael S. Lieberman, Zwerling, Mark, Ginsberg and Lieberman, P.C., Marvin D. Miller, Alexandria, Va., on brief), for appellee.

1. The motion was granted with regard to the Uzi submachine gun and denied as to the silencer. The district court stated that the validity of the seizure of other items of evidence could be tested at the time they are offered at trial.

Before WINTER, Chief Judge, RUSSELL, Circuit Judge, and McMILLAN, United States District Judge for the Western District of North Carolina, sitting by designation.

HARRISON L. WINTER, Chief Judge:

Defendant, Laura Jane Whitehorn, was indicted for assault, for possession of numerous false identification documents and implements designed for manufacture of false identification, and for possession of an Uzi submachine gun and a silencer. She moved to suppress certain physical evidence, most of which had been discovered during a so-called "bomb sweep" but which was thereafter seized under a search warrant. The district court granted in part and denied in part her motion, but its ruling lacked specificity as to all of the evidence to be suppressed.[1] Thereafter the trial began, but the district court granted defendant's motion for a mistrial when a dispute arose as to whether certain physical evidence was within the scope of the suppression order. The district court then immediately took additional evidence on the suppression issue. It ruled that everything seen in the bomb sweep and recognized to have evidentiary value was to be suppressed. Under this test, it suppressed the Uzi, two handguns, the silencer, bomb-making components and assembled detonating devices, blank social security cards and a machine for manufacturing false identification. It also indicated that other items might be suppressed depending upon their significance to the agent making the bomb sweep.

The government appeals from both suppression orders, and we reverse and remand for further proceedings.

I.

In a search for fugitives from a 1981 Brinks robbery involving the murder of two police officers, the FBI obtained an

The government later obtained a severance of the count charging possession of the Uzi and filed a notice of appeal from the portion of the district court's order suppressing it.

arrest warrant for Dr. Alan Berkman and in May 1985 entered an apartment in which several of the fugitives were living. Before entry, the agents were aware that the apartment was occupied by members of a criminal organization associated with several bombings of public buildings, and that some members of the same organization had recently been arrested in possession of a large quantity of dynamite from a stolen shipment, not all of which had been recovered.

Defendant was in the apartment when the agents entered and she resisted their entry. She refused to open the door even after proper identification of the agents and their purpose. Before they effected forcible entry, the agents heard a rustling and ripping of papers inside the apartment. When the agents successfully forced the door, defendant was standing in the front hall. She refused to move or to identify herself, and an agent forced her to the floor where she was handcuffed. Two other agents made a 4–5 minute search of the apartment. They did not find Dr. Berkman, and they observed no items of evidentiary significance. They removed defendant from the apartment and left it, closing the door behind them. One agent was posted on the landing outside the apartment to prevent entry by anyone. Steps to obtain a warrant authorizing a search of the premises were undertaken.

Because of the time which had elapsed between the agents' first knock at the door and their entry into the apartment, one of the agents became fearful that defendant may have set an explosive device within the apartment to destroy evidence or injure agents. He therefore radioed for assistance to sweep the apartment for explosives. He did not, however, take the usual precautions of evacuating the building, summoning emergency utility services, notifying the apartment manager, or calling the fire department or a bomb disposal unit, but persons attempting to enter the building were told to remain outside.

In due course, another agent arrived to perform the bomb sweep. He examined the apartment and a basement storage area for 1½–2 hours. While he seized nothing and made no inventory of his findings, he discovered a large suitcase containing equipment necessary for manufacturing photographic identification cards, a large quantity of cash, hundreds of blank social security cards, an Uzi submachine gun, two handguns, one of which was equipped with a silencer, and a blue cabinet containing dozens of assembled but not activated bomb detonating devices. He radioed his findings to the agents who were drafting a search warrant affidavit, and they included in the affidavit a statement that a protective search had taken place and a submachine gun observed.

After the bomb search, nothing having been taken and all objects returned to their initial place, the apartment was again secured until the search warrant was issued and delivered. The apartment was then searched again and the submachine gun, the handguns and silencer, the cabinet with detonating devices and many other items were seized. Fingerprints of defendant, Dr. Berkman and others were uncovered and the agents found written instructions for manufacturing explosive devices and for using and storing dynamite, as well as documents outlining plans to bomb federal installations in Maryland and Washington and photographs and drawings of two public installations that had been bombed in 1983 and 1984.

## II.

As a preliminary matter, we first address defendant's contention that we lack jurisdiction to consider the government's appeal from the district court's second suppression order. Defendant argues that because the trial began and she was placed in jeopardy, the government lost its right of appeal under 18 U.S.C. § 3731.

The argument is directly contrary to our holding in *United States v. Shears*, 762 F.2d 397, 399–400 (4 Cir.1985). There we held that we had jurisdiction to entertain the government's appeal when the notice of appeal of a pretrial suppression order was filed after the trial began and after defendant's motion for a mistrial was granted.

Our rationale was that since defendant's motion for a mistrial was granted, there was no double jeopardy bar to retrial and therefore by the terms of § 3731, the government had a right to appeal.

### III.

■ The district court found that the original entry into the apartment was lawful but that the bomb sweep was unlawful. Defendant does not now contest the legality of the original entry. The district court's legal conclusion about the validity of the bomb sweep stemmed from its factual finding that "the overall conduct of the officers render[s] untenable the argument that they acted in accordance with fear for their and others' safety. There is no evidence that anyone was evacuated from the building or warned of the potential danger, or that the agents had otherwise prepared for the risk of an exploding bomb." From our review of the record, we think that the district court correctly summarized the evidence on this point, and we are unable to say that its ultimate factual finding was clearly erroneous.[2]

■ The district court also found that the affidavit on which the warrant was issued established probable cause, aside from any mention of the bomb sweep and discovery of the Uzi. The court therefore concluded that the search and seizure conducted pursuant thereto did not violate defendant's Fourth Amendment rights. We are in agreement. While the fact of the bomb sweep and discovery of the Uzi would not establish probable cause to issue a search warrant because there were not exigent circumstances to make the sweep, the inclusion of this "tainted" data does not invalidate the warrant.[3] *See, e.g., United States v. Spetz,* 721 F.2d 1457, 1467–68 (9 Cir.1983); *United States v. Kinney,* 638 F.2d 941, 945 (6 Cir.), *cert. denied,* 452 U.S. 918, 101 S.Ct. 3056, 69 L.Ed.2d 423 (1981);

*United States v. Agapito,* 620 F.2d 324, 338 (2 Cir.), *cert. denied,* 449 U.S. 834, 101 S.Ct. 107, 66 L.Ed.2d 40 (1980).

### IV.

The question remaining for decision is the effect of discovery of evidence as a result of the illegal bomb sweep when that same evidence is subsequently found and seized under a valid search warrant. The district court correctly ruled that on the authority of *Segura v. United States,* 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984), the evidence discovered for the first time during the search pursuant to the warrant is admissible. But what concerns us is evidence that was first discovered during the illegal search and thereafter rediscovered and seized under a valid search warrant. While the question that faces us was present in the appeal to the Second Circuit which ruled that such evidence was tainted and inadmissible, that aspect of the case was not reviewed by the Supreme Court. The district court in the instant case was of the view that the taint of the first illegal search applied to all evidence discovered in that search and that the taint could not be dissipated by a subsequent search under a valid search warrant. It relied in large part on *United States v. Collazo,* 732 F.2d 1200 (4 Cir.1984), *cert. denied,* 469 U.S. 1105, 105 S.Ct. 777, 83 L.Ed.2d 773 (1985).

Aside from *Segura,* the only other relevant Supreme Court ruling on the issue is *Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), which held generally that unlawfully obtained evidence was nevertheless admissible if it could be established that ultimately or inevitably it would have been discovered by lawful means. *Nix* was concerned with evidence pertaining to the discovery and condition of a murder victim's body which was actually discovered by interrogation of

---

**2.** We note that another court evaluating the same incident in connection with the trial of another member of the group also concluded that the bomb sweep was illegal. *United States v. Evans,* 629 F.Supp. 1544, 1553 (D.Conn.1986).

**3.** The record contains a memorandum of the magistrate who issued the warrant stating specifically that he would have concluded that the affidavit set forth probable cause for issuance of the warrant even without mention of the bomb sweep and discovery of the Uzi.

a defendant in violation of his right to counsel but with respect to which there was ample and compelling evidence to show that search parties were approaching the actual location of the body, that the search would have continued and that the body would inevitably have been found. The significance of *Nix* is its recognition and application of the "inevitable discovery" exception to the exclusionary rule barring the use of evidence obtained in violation of constitutional rights.

■ While the district court concluded that *Nix* should not be applied to evidence discovered during the first invalid search, we and two other courts of appeals conclude otherwise.[4] *See United States v. Merriweather,* 777 F.2d 503, 506 (9 Cir. 1985), *cert. denied,* — U.S. —, 106 S.Ct. 1497, 89 L.Ed.2d 898 (1986); *United States v. Moscatiello,* 771 F.2d 589, 603–04 (1 Cir. 1985), *vacated on other grounds sub. nom. Carter v. United States,* — U.S. —, 106 S.Ct. 2241, 90 L.Ed.2d 688 (1986). The issue is not free from doubt nor is there unanimity in how it should be resolved, *see, e.g., United States v. Segura,* 663 F.2d 411 (2 Cir.1981), *aff'd on other grounds,* 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984); *United States v. Pimentel,* 626 F.Supp. 1372, 1374 (S.D.N.Y.1986); *People v. Schoondermark,* 717 P.2d 504, 506 (Col. App.1985), but we are persuaded by *Merriweather* and *Moscatiello* that unless and until the Supreme Court rules otherwise, the inevitable discovery rule may be applied even though the evidence validly obtained under a search warrant was previously uncovered in an illegal search. Stated otherwise, where it appears that evidence "inevitably would have been discovered by lawful means," the deterrence rationale of the exclusionary rule has "so little basis" that the rule should not be

applied. *Nix,* 467 U.S. at 444, 104 S.Ct. at 2509.

This conclusion requires us not only to reverse the district court's suppression orders but to remand the case for further proceedings to determine the applicability, if any, of the inevitable discovery rule to the various items of evidence that were suppressed.

REVERSED AND REMANDED.

---

4. We did not decide the issue in *Collazo.* There, agents made an illegal search and subsequently obtained defendant's consent to a second search after defendant was told about the incriminating evidence discovered in the illegal search. We held that the consent may have been sufficiently tainted by the illegal search so as to warrant suppression of the evidence obtained in the second search. In short, the taint of the illegal search may have been an operative factor in the giving of consent so that the taint extended to the second search. By contrast, the premise of the inevitable discovery doctrine is that the illegal search played no real part in discovery of incriminating evidence. Only then, if it can be shown that the taint did not extend to the second search, would the product of the second search be admissible.