UNITED STATES of America

v.

Clarenetta WRIGHT and Clarence Wright and Wendell Haywood Griffin, Defendants.

Crim. A. No. 88–00002–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

April 7, 1988.

Liam O'Grady, Asst. U.S. Atty., for U.S.

Dan Burke, Clarence B. Wright, Brian M. O'Connor, Clarenetta Wright, Andrew F. Carroll, Wendell H. Griffin, for defendants.

## MEMORANDUM OPINION

ELLIS, District Judge.

A three count indictment charged defendants, Clarenetta Wright, Clarence Wright, and Wendell Haywood Griffin, with robbing of the Washington Telephone Federal Credit Union. Defendants moved to suppress (i) evidence found during a search of Clarenetta and Clarence Wright's apart-

ment, (ii) evidence found during a search of Clarence Wright's automobile and Wendell Griffin's automobile, and (iii) confessions made by Clarenetta and Clarence Wright. A hearing was held on defendants' motions, at which the Court heard testimony from four FBI agents as well as defendant Clarence Wright. Also, a proffer was made as to the testimony of defendant Clarenetta Wright.[1] At the conclusion of the hearing, the Court took defendants' motions under advisement and requested and received supplemental memoranda from the parties. The Court subsequently entered an Order setting forth the Court's essential findings as required by Rule 12(e), Fed.R.Crim.P., denying defendants' motions. This Memorandum Opinion records at greater length the Court's reasons for denying defendants' motions.[2]

## BACKGROUND

### A. The Affidavit[3]

On December 17, 1987, two black males, both approximately 5'5" tall with slight to medium builds, robbed the Washington Telephone Federal Credit Union (Credit Union). FBI Special Agent Dennis Condon was designated to lead the robbery investigation. He interviewed the bank manager, Mary Wilson, who advised him that the Credit Union was robbed at approximately 12:20 p.m. Condon's investigation revealed that, at approximately 12:12 p.m., a cash delivery of $60,000 was made to the Credit Union by the Federal Armored Express armored car service. Forty thousand dol-

lars of the $60,000 delivered to the Credit Union was in the form of twenty dollar bills. Shortly thereafter, at about 12:20 p.m., two black males entered the Credit Union and proceeded to take a portion of the cash shipment. Approximately $40,000 was taken in the robbery, including $38,000 in twenty dollar bills.

According to Wilson, when the two robbers entered the Credit Union, the first of the two robbers glanced quickly into Wilson's office while the second robber ran past the office through a door leading into the Credit Union's kitchen. This was the area where the cash shipments were routinely counted. Neither robber approached the teller counter. Both avoided the areas swept by the surveillance cameras. When Wilson stood up to see what was happening, the first robber approached her, took her by the arm, and escorted her to the door of her office. There, he placed her hand on a pistol stuck in his waistband.[4]

Wilson told Condon that the first of the two robbers was a black male, approximately 5'5" tall with a thin build, brown eyes and approximately 17 or 18 years of age. She said he wore a Redskins ski cap, blue jeans, a dark color jacket (possibly blue) and had a black handled revolver in his waistband. The second robber, according to Wilson, was also a black male, with the same stature and build, and approximately the same age. He wore a maroon ski mask.

Condon also learned from Wilson that a short time before the robbery occurred, a

---

1. Clarenetta's proffered testimony was that prior to her making any incriminating statements, she was told (i) that her brother had made incriminating statements, and (ii) that the police knew of the items found in her apartment, i.e. the ski mask and handguns.

2. After defendants' motions were denied at the suppression hearing, defendants Clarenetta and Clarence Wright entered conditional pleas of guilty, reserving the right to appeal the issues covered in this Memorandum Opinion. Defendant Griffin elected to go to trial. The jury could not reach a verdict and a mistrial was declared. Griffin subsequently entered a guilty plea conditioned in the same fashion as the pleas of his codefendants. All defendants are now awaiting sentencing.

3. The following facts are derived from FBI Special Agent Dennis Condon's affidavit filed in support of a search warrant for Clarence and Clarenetta Wright's apartment, Clarence's GTI Volkswagen, and Clarenetta's Nissan. At the hearing on defendants' motions to suppress, Condon testified that he obtained these facts from interviews conducted by him and other agents in the course of the investigation.

4. While appearing in Court to plead guilty, Griffin asserted that he did not place Wilson's hand on the pistol, but that she must have inadvertently touched the pistol. This factual dispute is immaterial to the resolution of defendants' motions to suppress.

teller identified as Clarenetta Wright had returned to the Credit Union after being out to lunch. Wilson said Clarenetta was very calm both during and after the robbery and repeatedly inquired of other Credit Union personnel whether they had seen the robbers' faces. Wilson reported previous problems with Clarenetta Wright, including an incident on December 2, 1987, when Wright had been found with an unauthorized person in the back room area of the Credit Union where the money shipments are counted. In addition, shortly after Wright had commenced her employment at the Credit Union in September, 1987, $2,000 in travelers checks were found to be missing from the Credit Union. These checks were eventually cashed locally and several were endorsed by someone purporting to be Myra Smith. Condon was told that a police investigation revealed that Myra Smith's sister lived in the apartment next to Clarenetta Wright's.

On December 17, 1987, Condon interviewed Clarenetta Wright. Wright told Condon that shortly before the robbery she had gone to the Pizza Hut Restaurant to purchase her lunch. She said she then returned to the Credit Union where she proceeded to eat her lunch in the back room at approximately 12:15 or 12:20 p.m., at which time and place she apparently saw the robbers. Wright reported to Condon that the two robbers were probably in their teens and were of small physical stature. Wright also advised Condon that one of the two robbers displayed a silver or chrome revolver in a brown, leather shoulder holster. She described one of the two robbers as wearing a brown ski mask and the other as wearing a burgundy Redskins cap with a yellow stripe and eye and mouth cutouts. Wright also advised Condon that the robbers spent five minutes or less inside the bank and knew exactly where to go.[5]

Condon, in his affidavit, stated that he was advised by FBI Agent Raymond Smith that Smith went to the Pizza Hut near the Credit Union and was told by the manager that a young, black female fitting the description of Clarenetta Wright had come to the Pizza Hut at lunchtime on the robbery date and engaged in conversation with two young, black males.

On December 18, 1987, Investigator De Groot, who assisted in the investigation, provided Condon with two polaroid photographs which had been copied from the videotape removed from the Credit Union surveillance camera two days prior to the robbery. The polaroid photographs each depict a black male standing in the lobby of the Credit Union on December 15, 1987. Investigator De Groot advised Condon that branch manager Wilson had identified the individual in one of those photographs as a man who picked up Clarenetta Wright at the Credit Union on that date. Also on December 18, 1987, according to Condon's affidavit, Condon and De Groot were advised by Alexa Victoria Riggs, waitress at the Pizza Hut that on December 17, 1987 she served two young, black males who arrived at the restaurant at approximately 11:30 a.m. and who stayed approximately 45 minutes. Riggs later advised Condon that one of the two black individuals served by her appeared to be the same man depicted in one of the polaroid photographs obtained by Investigator De Groot.

On December 22, 1987, Condon conducted an investigation in the vicinity of Clarenetta Wright's apartment. He was advised by Ms. Leddon, the manager of the apartment building, that Clarence Wright, a black male, also resided in that apartment. She described Clarence Wright as a young, short black male. From a computer check of the Division of Motor Vehicles, Condon learned that Mr. Wright was a black male, twenty-one years old, 5'5″ tall and weighing 140 pounds. Leddon advised Condon that Wright was delinquent in making rent payments and was scheduled for eviction. Leddon also told Condon that she had observed in the apartment (i) Clarence Wright, (ii) a black female, and (iii) an

---

5. Condon also learned from Wright that she resided in an apartment building located in Dale City, Virginia.

individual who appeared to be one of the persons depicted in the polaroid photos.

Condon and De Groot then undertook surveillance of Clarenetta Wright's apartment. During this surveillance, he and De Groot observed two young black males who matched the general description of the bank robbers exit the apartment building and enter a late model red Volkswagen GTI automobile. Condon also observed a late model, maroon Nissan automobile parked in front of the same building. Further investigation revealed that the red Volkswagen was registered to Clarence B. Wright and the maroon Nissan to Clarenetta Wright.

According to Condon, he and De Groot followed the two black males in the red Volkswagen to a dead end road leading to the business location of National Tire Wholesalers (NTW). On their return to the apartment complex, Condon observed the men as they removed four tires from the Volkswagen and carried those tires into Clarenetta's apartment building. Condon then returned to NTW and was advised by the manager that he had just sold four tires to two black males. The NTW manager advised Condon that the purchase price, totaling $163.02, was paid chiefly in twenty dollar bills. The manager then removed a quantity of twenty dollar bills from the cash register and, after removing several bills received from other customers, he produced nine apparently new, sequentially numbered twenty dollar bills. These bills, the manager told Condon, were the same bills the black males used to pay for the new tires.

B. *The Stops and Securing of the Premises*

Armed with the above information, Condon sought and ultimately obtained a search warrant for Clarenetta Wright's apartment, the Volkswagen GTI, and the maroon Nissan. During the process of obtaining the warrant, FBI agents maintained surveillance of the apartment. Before the warrant was issued, however, two black males,

later identified as Wendell Griffin and Clarence Wright, emerged from the apartment building. As Griffin attempted to drive away from the apartment in his automobile, he was forcibly stopped by several FBI agents. At gun point, he was asked to get out of his car. He complied, was patted down, and his car was searched for weapons. The FBI agents then holstered their weapons and asked Griffin for identification. Griffin produced a small pouch which contained a large wad of bills. The agents asked whether they could examine the pouch and Griffin consented. The pouch contained thirty-six five dollar bills, two ten dollar bills, and one twenty dollar bill. Griffin then consented to a search of his automobile. Upon completion of the search, the agents received word that Griffin had been implicated as one of the bank robbers by co-defendant Clarence Wright. Griffin was then arrested and advised of his rights.

Contemporaneously with the stop of Griffin, agents were also forcibly stopping Clarence Wright as he started his car in the parking lot of the building. After a pat-down, and a search of Clarence Wright's car for weapons, FBI Special Agent Gregory Dillon noticed that someone was observing the scene from Clarenetta Wright's apartment. Concerned that the observer might destroy or conceal evidence, Dillon immediately went up to the apartment. There, he observed a youth, later identified as Mr. Armstrong, peering out of the apartment's open door. Dillon stopped Armstrong, patted him down, and then walked through the apartment in order to secure the premises and ensure that no one else was inside destroying or concealing evidence. While making this "protective sweep," Dillon observed, in plain view, two ski masks with eye holes cut out, resembling those identified in the robbery.[6] Also in plain view were several handguns and rifles, including a holstered black handled pistol answering the description of the one observed during the robbery. Dillon also reported seeing batches of new clothing with sales tags still at-

---

**6.** The Court rejects Clarence Wright's testimony that the ski masks were not in plain view, but

hidden under a Nike bag.

tached and numerous boxes purporting to contain television sets and other consumer items, all readily apparent. The agent testified that the apartment was filled with so many boxes, all in plain view, that it "looked like Christmas." Dillon did not seize any of these objects and conducted no further search. He secured the apartment and returned to the parking lot, where other agents were holding Wright.

At this time Wright, who was not dressed warmly, asked to return to the apartment. Dillon and Wright then entered the apartment and Dillon was soon thereafter notified that a search warrant had been executed. Approximately ten to fifteen minutes had elapsed between the time Dillon entered the apartment and the time that the warrant had issued. A thorough search of the apartment was then conducted and Wright was arrested and given his *Miranda* warnings. He signed a waiver form and confessed to his involvement in the robbery. He also implicated Wendell Griffin as the other bank robber and stated that his sister, Clarenetta, also had played a role in the robbery.

Shortly thereafter, Clarenetta Wright was arrested at her place of employment, the Credit Union. One thousand three hundred and eighteen dollars in cash was found in her purse, including sixty-four twenty dollar bills. Clarenetta Wright was read her *Miranda* rights, signed a waiver form, and confessed that she had received $10,000 from her brother Clarence and Wendell Griffin. She also stated that she recognized Clarence Wright and Griffin when they entered the bank.

## ANALYSIS

### A. *The Search Warrant*

■ All defendants assert the invalidity of the search warrant because, they argue, it was based on an affidavit that contains intentional falsehoods. *See Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978); *United States v. Fawole*, 785 F.2d 1141 (4th Cir.1986). Specifically, defendants assert: (1) that the photographs shown to the Pizza Hut employees and Wright's landlord were of such poor quality that a reliable identification could not be made, yet Condon failed to acknowledge this fact in his affidavit; (2) that neither the Pizza Hut manager nor the waitress interviewed by Agent Smith identified Clarenetta Wright or saw anyone fitting her description talking with two black males, yet Condon asserted that the manager did so identify Wright; and (3) that Condon's assertion that the two men who were seen at the NTW store matched the description of the robbers was incorrect, as one of the tire purchasers was Willie Armstrong, who is approximately 5'10" tall and weighs 200 pounds, rather than of slight build and stature as the robbers had been described.

The first issue presented with respect to the search warrant is whether Agent Condon's statements set forth in his affidavit were false and, if so, were they deliberately false or made with reckless disregard for the truth. *Franks*, 438 U.S. 154, 98 S.Ct. 2674. The Court finds that Condon's statements were incorrect, but made in good faith. They were neither deliberately false, nor made with reckless disregard for the truth. Unquestionably, the photographs are of poor quality. Condon conceded this in his hearing testimony and indicated that reliable identification based on them was unlikely. Still, reasonable people might disagree whether they wholly preclude any identification. To be sure, however, the affidavit should have revealed the problem, or omitted any reliance on the photographs. The Pizza Hut and tire store references were also not entirely correct. Again, though, none of these errors was a deliberate falsehood designed to win the issuance of a warrant by false means. Rather, they were simply good faith mistakes, and the affidavit was relied upon in good faith by the agents conducting the search. *See United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).

■ Even assuming that certain facts were misrepresented, the remaining affidavit facts amply establish probable cause for the search. *Franks*, 438 U.S. 154, 98 S.Ct. 2674; *see also Fawole*, 785 F.2d 1141. With respect to Clarenetta Wright, the affidavit establishes: (1) that she works at the

Credit Union, and that the robbery seemed to be an "inside job;" (2) that her actions during the robbery were suspicious, as she was calm and asked the other tellers if they had gotten a good look at the robbers; (3) that she had been found with an unauthorized person in the back room money counting area of the Credit Union approximately two weeks prior to the robbery; (4) that shortly after Clarenetta began working for the Credit Union in September 1987, $2,000 worth of travelers' checks were found to be missing, that these checks were cashed locally and were endorsed by a Myra Smith, whose sister resides next to Clarenetta; and (5) that the home address given by Clarenetta was the apartment of her brother, Clarence Wright, whose general physical description matched the description of one of the bank robbers, as given by the Credit Union manager, Mary Wilson. Clearly, the affidavit sets forth sufficient facts to support a finding of probable cause to search Clarenetta's apartment, automobile, and Clarence's automobile for fruits of the robbery and other incriminating evidence.[7]

B. *The Securing of the Premises*

█ Agent Dillon's sweep search and securing of the premises occurred shortly before notice was received that the warrant had issued. All defendants attack this sweep as an illegal warrantless search. Therefore, they argue, all evidence seized in the apartment must be suppressed, including the ski masks and pistol. It is settled, however, that exigent circumstances, *i.e.,* risk that evidence may be concealed or destroyed, may justify a warrantless entry and sweep to secure the premises. *See United States v. Cuaron,* 700 F.2d 582 (10th Cir.1983); *United States v. Korman,* 614 F.2d 541 (6th Cir.), *cert. denied,* 446 U.S. 952, 100 S.Ct. 2918, 64 L.Ed.2d 808 (1980). The question presented, therefore, is whether there existed "exigent circumstances" in this instance sufficient to justify the warrantless entry and sweep. The Court concludes there were.[8]

Agent Dillon testified at the suppression hearing that he observed a black male watching the stop of Clarence Wright intently from a window in Clarenetta Wright's apartment. Dillon reasonably believed that the recovery of the fruits and instrumentalities of the crime was in jeopardy given that another individual, who apparently knew the police were outside the apartment, was in a position to destroy or conceal the evidence. These are, manifestly, exigent circumstances; they are ample to support reasonable steps taken to secure the apartment to

7. Determining the existence of probable cause is a practical, common sense decision, predicated on whether there is a "fair probability" that evidence of a crime will be found in a particular place. *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

8. Even assuming the absence of exigent circumstances, however, the agent's securing of the premises to maintain the status quo may not constitute an unreasonable "seizure." *See Segura v. United States,* 468 U.S. 796, 805–813, 104 S.Ct. 3380, 3385–3390, 82 L.Ed.2d 599 (1984) (Burger, C.J., and O'Connor, J.). In *Segura,* Chief Justice Burger and Justice O'Connor found that an eighteen to twenty hour warrantless occupation of defendants' apartment to maintain the status quo in anticipation of a search warrant does not require exigent circumstances to constitute a reasonable Fourth Amendment seizure. This Court notes, however, that *Segura* has been sharply criticized. *See* Dressler, *A Lesson in Incaution, Overwork, and Fatigue: The Judicial Miscraftsmanship of* Segura v. United States, 26 Wm. & Mary

L.Rev. 375, 422 (1985) (*"Segura* is a disaster as a written opinion"); Note, *The Securing of the Premises Exception: A Search for the Proper Balance,* 38 Vand.L.Rev. 1589 (1985) ("The most distressing feature of *Segura* is that the Chief Justice has created an exception [to the warrant requirement] without identifying any corresponding need"); *see also* W.R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment §§ 6.5(c), 11.4(f) (1987). Given the criticism of *Segura,* and the fact that the opinion of Chief Justice Burger and Justice O'Connor is not binding, the Court elects to ground its decision on the existence of exigent circumstances and hence need not address the *Segura* constitutional issue. *See Brockett v. Spokane Arcades, Inc.,* 472 U.S. 491, 501, 105 S.Ct. 2794, 2800, 86 L.Ed.2d 394 (1985) ("never anticipate a question of constitutional law in advance of the necessity of deciding it"). Here, there existed exigent circumstances permitting the warrantless entry into the Wrights' apartment. Accordingly, the Court's Order dated February 29, 1988, which adopts the *Segura* rationale, is amended to reflect that the Court need not reach that issue.

insure against the loss of evidence.[9] Agent Dillon did just this. He secured the apartment until the search warrant arrived approximately ten minutes later. Dillon also testified that, while securing the premises, he saw the handguns and ski masks in plain view, and that the ski masks resembled those described in the robbery. While he did not seize the masks or guns, he would have been justified in doing so, for (i) they were in plain view, (ii) he discovered them inadvertently as he swept through the apartment, and (iii) his intrusion and presence in the apartment affording the plain view was lawful.[10] *Texas v. Brown,* 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983); *United States v. Fawole,* 785 F.2d 1141, 1145 (4th Cir.1986).

■ Even assuming that Agent Dillon's protective sweep was illegal, the evidence observed in the apartment need not be suppressed because this evidence was very shortly thereafter seized pursuant to a valid search warrant. *See United States v. Whitehorn,* 813 F.2d 646 (4th Cir.1987) (appeal pending). In *Whitehorn,* incriminating evidence was found as a result of an illegal, warrantless bomb sweep. That same evidence, however, was subsequently found and seized under a valid search warrant. 813 F.2d at 649. The Fourth Circuit, applying the inevitable discovery rule,[11] held that evidence validly obtained under a search warrant was admissible even

though that evidence was previously uncovered in an illegal search. 813 F.2d at 650. Here, as there, the evidence in defendants' apartment was ultimately seized pursuant to a valid search warrant. Indeed, notice that the warrant had issued was received only ten to fifteen minutes after the sweep of the apartment. The inevitability of discovery in this context cannot reasonably be disputed.[12] Therefore, even assuming an illegal entry, the incriminating evidence need not be suppressed.

## C.  *Clarence Wright*

■ Defendant Clarence Wright asserts that he was arrested without probable cause and that he was interrogated and made a confession prior to receiving his *Miranda* warnings. His position fails factually and legally. Wright was not *arrested* by police outside the apartment. Rather, he was stopped and patted-down based upon a reasonable suspicion that he was involved in the bank robbery. Such stops are lawful. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *United States v. Moore,* 817 F.2d 1105 (4th Cir. 1987). Nor is there any doubt that the agent's suspicion was soundly based. Clarence is the brother of Clarenetta and matched the description of one of the bank robbers. Also, Clarence was leaving the apartment where the police suspected the

9.  The Court also finds that the agents here did not *create* the exigent circumstances which permitted them to enter and secure the premises. Nor is this an unimportant point. The exigent circumstances doctrine is an exception to the warrant requirement and must therefore be strictly construed and very sparingly applied. Courts must take special care to subject claims of exigent circumstances to close scrutiny to ensure that the fundamental rights safeguarded by the Fourth Amendment are not lost through a broad or sham application of the doctrine. Courts must ensure that police authorities do not manipulate or create artificial circumstances for the purpose of avoiding the warrant requirement. Warrantless sweep searches should be the rare exception, upheld only where, as here, the authorities act in good faith on the basis of information which would lead a reasonable person to be concerned that evidence might be lost or destroyed unless the premises are secured. *See United States v. Cuaron,* 700 F.2d 582 (10th Cir.1983).

10.  Certainly, the agent's discovery of the mask and guns furnished strong support for continuing the stop of Clarence Wright.

11.  The inevitable discovery rule was announced in *Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), where the Supreme Court held that unlawfully obtained evidence was nevertheless admissible if it could be established that ultimately or inevitably the evidence would have been discovered by lawful means. "The significance of *Nix* is its recognition and application of the 'inevitable discovery' exception to the exclusionary rule barring the use of evidence obtained in violation of constitutional rights." *United States v. Whitehorn,* 813 F.2d 646, 650 (4th Cir.1987).

12.  *Cf. Segura v. United States,* 468 U.S. 796, 801, 104 S.Ct. 3380, 3383, 82 L.Ed.2d 599 (1984) (warrant issued 19 hours after entry by agents).

fruits and instrumentalities of the robbery were located. Within several minutes of Wright's detention, Agent Dillon secured the premises and discovered the ski masks and handguns. The police then had ample probable cause to suspect Wright of the robbery, and therefore Wright's detention prior to arrest was entirely reasonable.

█ With respect to the questioning of Wright prior to his being read the *Miranda* warnings, the evidence presented at the suppression hearing showed that Wright was questioned about the purchase of the tires at NTW, his debts, and the guns in his apartment. Arguably, this discussion was related to the robbery investigation. Yet no confession was given until *after* Wright received his *Miranda* warnings,[13] and there was no evidence that any promises or threats were made during Wright's initial questioning. Under these circumstances it is plain that Wright's confession was knowingly and voluntarily given. *See Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985) (although first confession made prior to *Miranda* warnings excluded, subsequent confession not suppressed where "knowingly and voluntarily made"); *McFadden v. Garraghty,* 820 F.2d 654 (4th Cir.1987). Accordingly, Clarence Wright's motion to suppress is denied.

### D. *Clarenetta Wright*

█ Clarenetta Wright moves to suppress her confessions, asserting that her statements were improperly induced because (i) the agents told her that her brother had confessed, but her brother's confession was illegally obtained, (ii) the agents told her of the evidence found in the apartment, but this evidence was illegally obtained, and (iii) the police told her that although her confession was not required, "it would be better for her" if she told the truth. These assertions are without merit. First, as previously discussed, neither Clarence Wright's confession nor the search was illegal. Second, there is no evidence whatever that any promises, threats, or coercion

were used to induce Clarenetta to confess. Finally, even if Clarenetta was advised of her brother's confession and then admonished to tell the truth, her confession was made after she received her *Miranda* warnings and after she signed a waiver form. It was voluntary and valid. *See Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985); *McFadden v. Garraghty,* 820 F.2d 654 (4th Cir.1987). Accordingly, Clarenetta's motion to suppress is denied.

### E. *Wendell Griffin*

█ Griffin asserts that the warrantless stop of his vehicle was made without reasonable suspicion. This assertion is meritless. The agent who stopped Griffin testified (i) that Griffin fit the description of one of the bank robbers, (ii) that Griffin was observed in the Wright's apartment where the fruits and instrumentalities of the robbery were believed to be at the time of surveillance, and (iii) that he was with the other suspect, Clarence Wright. In addition, the agents were aware that the bank robbers were armed. Accordingly, the initial forcible stop was permissible. *See Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *United States v. Moore,* 817 F.2d 1105 (4th Cir.1987). In any case, Griffin was subsequently implicated in the robbery by both Clarence and Clarenetta Wright.

Griffin further asserts that his detention, which lasted approximately sixty minutes prior to his arrest, was for an unreasonably long period of time. But Griffin consented to the search of his vehicle and pouch, and the testimony adduced at the suppression hearing indicated that this consensual search accounted for the lion's share of Griffin's detention. *See United States v. Corbin,* 662 F.2d 1066, 1070 (4th Cir.1981) (detention lasting over one and one-half hour period was not impermissible as defendants had consented to search). Only shortly after the search was completed did the agents receive word that Griffin had

13. The Court rejects Clarence Wright's testimony that he confessed prior to his *Miranda* warn-    ings.

been implicated by Clarence Wright. Accordingly, Griffin's motion to suppress is denied.

For the reasons set forth in this Memorandum Opinion, defendants' motions to suppress are DENIED. An appropriate Order has been entered.