**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

v.

JOSEPH ROBERT YENGEL, JR.,

*Defendant-Appellee.*

No. 12-4317

Appeal from the United States District Court
for the Eastern District of Virginia, at Newport News.
Henry Coke Morgan, Jr., Senior District Judge.
(4:12-cr-00011-HCM-FBS-1)

Argued: October 23, 2012

Decided: February 15, 2013

Before TRAXLER, Chief Judge, and WYNN and
THACKER, Circuit Judges.

---

Affirmed by published opinion. Judge Thacker wrote the
opinion, in which Chief Judge Traxler and Judge Wynn
joined.

---

## COUNSEL

**ARGUED:** Richard Daniel Cooke, OFFICE OF THE
UNITED STATES ATTORNEY, Richmond, Virginia, for
Appellant. Caroline Swift Platt, OFFICE OF THE FEDERAL

PUBLIC DEFENDER, Alexandria, Virginia, for Appellee.
**ON BRIEF:** Neil H. MacBride, United States Attorney,
Alexandria, Virginia, for Appellant. Michael S. Nachmanoff,
Federal Public Defender, Alexandria, Virginia, Rodolfo
Cejas, II, Assistant Federal Public Defender, Patrick L. Bry-
ant, Appellate Attorney, OFFICE OF THE FEDERAL PUB-
LIC DEFENDER, Norfolk, Virginia, for Appellee.

---

## OPINION

THACKER, Circuit Judge:

The instant case requires this court to consider whether the
district court properly excluded evidence gained from a war-
rantless search. In so doing, we must address whether it was
reasonable for an officer to enter a locked closet without a
search warrant after responding to an armed domestic dispute,
arresting the suspect and removing him from the residence,
and gaining information that indicated a grenade may have
been present in the closet. Based on the objective facts avail-
able to the officer at the time of the search, we agree with the
district court and conclude exigent circumstances did not exist
to justify the warrantless search in this case. Thus, the evi-
dence obtained from such search was properly excluded.

I.

The relevant facts are undisputed by the parties. In the late
afternoon of December 31, 2011, Sergeant Brian Staton
responded to a call regarding a domestic assault at the home
of Joseph Robert Yengel, Jr. ("Yengel"). The 911 dispatcher
informed Sergeant Staton that a domestic dispute had erupted
between Yengel and his wife. Sergeant Staton also learned
that Mrs. Yengel had vacated the residence, and Yengel was
potentially armed and threatening to shoot law enforcement
personnel.

At around 4:00 p.m., Officer J.M. Slodysko was the first to arrive on the scene. The Yengels' two-story home featured a walk-up front porch and was located in a dense residential neighborhood, with very little space separating adjacent homes. Upon his arrival, Officer Slodysko observed that Yengel was "extremely upset." J.A. 118.[1] Officer Slodysko was, however, able to calm Yengel, and to persuade him to come out of the residence onto the front porch, unarmed. Shortly thereafter, when Sergeant Staton arrived on the scene, Yengel was seated on the top step of the front porch, "agitated and emotional," but unarmed.[2] J.A. 57–58, 124. The officers then further calmed Yengel, arrested him, and removed him from the scene.

While still at the scene, Sergeant Staton then interviewed Mrs. Yengel and Yengel's mother, Karol Yengel. During the interviews, Sergeant Staton learned Yengel kept a large number of firearms and a "grenade" inside the house. Sergeant Staton also learned that Mrs. Yengel's young son was sleeping in one of the upstairs bedrooms. Upon learning of the possible existence of a "grenade," Sergeant Staton did not immediately call for the assistance of explosive experts, nor did he evacuate the area. Rather, Sergeant Staton asked Mrs. Yengel to show him where the alleged grenade was kept.

Mrs. Yengel directed Sergeant Staton into the upstairs master bedroom. There, she collected a variety of firearms which were strewn about the bedroom, placed the firearms on the bed, and requested that Sergeant Staton remove them. She

---

[1]Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

[2]The parties dispute Yengel's positioning upon Sergeant Staton's arrival. Sergeant Staton indicated that when he arrived, Yengel was sitting on the top stair leading up to the front porch. J.A. 57. Yengel contends that he was sitting in a chair on the front porch. Appellee's Br. 4. We do not find the district court's factual finding that Yengel was sitting on the top step to be clearly erroneous, nor do we find this factual dispute material to our analysis.

said nothing further at that point about the existence or removal of the alleged grenade. Therefore, Sergeant Staton reiterated his request to locate the "grenade," and Mrs. Yengel directed him to a nearby guest bedroom located at the end of the upstairs hallway, directly next to the bedroom in which her young son was sleeping.[3] Mrs. Yengel led Sergeant Staton to a closet inside the guest bedroom that was locked with a combination keypad and thumbprint scanner. Mrs. Yengel informed Sergeant Staton that she did not know the combination to the lock and did not have access to the closet, but told him the "grenade" was kept inside. She then gave Sergeant Staton permission to "kick the door open" and told him to "do whatever you need to do to get in there." J.A. 64.

At this point, Sergeant Staton still did not notify explosive experts, did not evacuate the house or nearby homes, did not remove the sleeping child from the room located directly next to the room where the "grenade" was allegedly stored, and did not secure a search warrant. Instead, he simply pried open the closet with a screwdriver.

Once inside the closet, Sergeant Staton identified a variety of military equipment, including two gun safes, camouflage, and other weapons. Sergeant Staton also identified what he thought to be a military ammunition canister that he believed might contain the possible grenade.

After the warrantless entry into the closet, Sergeant Staton ordered an evacuation of the house, which at the time still included Mrs. Yengel's young son, as well as an evacuation of the surrounding residences. At approximately 6:25 p.m., he also notified the James City County Fire Marshal's office, and

---

[3]While there is some ambiguity in the record as to whether the bedroom in which the child was sleeping was adjacent to, or opposite from, the guest bedroom containing the locked closet, it is undisputed — and salient to our analysis here — that his room was in very close proximity to the guest bedroom, and we will refer to the layout of the house in such terms.

the Naval Weapons Station, requesting the assistance of its Explosive Ordnance Disposal ("EOD") team. At around 7:00 p.m., Investigator Kendall Driscoll of the James City County Fire Marshal's office arrived on the scene, and began gathering further information from Mrs. Yengel by telephone, as she had by then been removed from the scene. Mrs. Yengel informed Investigator Driscoll that she had seen her husband place a "grenade" — four inches by two inches, dark green in color, with a pin in the top — into the closet two years prior. Shortly thereafter, around 7:30 p.m., the EOD team arrived and searched the open closet. Once inside the closet, the EOD team found a backpack containing not a grenade, but a one pound container of smokeless shotgun powder and a partially assembled explosive device attached to a kitchen timer. Law enforcement had been on the scene approximately three and a half hours at this point.

On February 14, 2012, Yengel was charged with possession of an unregistered firearm, in violation of 26 U.S.C. §§ 5861 and 5845, that is, "a combination of parts designed and intended for use in converting a device into a destructive device, not registered to him in the National Firearms Registration and Transfer Record." J.A. 8. On March 8, 2012, Yengel filed a motion to suppress evidence gained from the warrantless search of the locked closet.

On March 27, 2012, the district court conducted a hearing to consider Yengel's motion. The district court heard testimony from Yengel, Sergeant Staton, and Investigator Driscoll. The district court also admitted as exhibits a picture of a door lock similar to the one used by Yengel, Officer Slodysko's report, and pictures of the explosive device and shotgun powder recovered from the closet.

The district court granted Yengel's motion to suppress from the bench and stated its reasoning by order dated April 3, 2012. The district court concluded the warrantless search did not fall into one of the narrow and well-delineated exceptions

to the warrant requirement, and, therefore, violated the Fourth Amendment. Specifically, the district court determined that neither Mrs. Yengel's consent to the search, nor exigent circumstances justified the warrantless search. The Government filed a motion for reconsideration on April 13, 2012, which the district court subsequently denied. On April 25, 2012, the Government filed a timely notice of appeal with this court.

## II.

On appeal, the Government argues only that the district court erred in concluding the warrantless search of the closet was not justified by exigent circumstances. When considering an appeal of a motion to suppress, we review the district court's factual findings for clear error, and its legal determinations de novo. *United States v. Hill*, 649 F.3d 258, 262 (4th Cir. 2011).

## III.

The most basic principle of Fourth Amendment jurisprudence — and the genesis of our analysis here — is that warrantless searches and seizures inside a home are presumptively unconstitutional. *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). "Nevertheless, because the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions." *Id.* (citing *Flippo v. West Virginia*, 528 U.S. 11, 13 (1999) (per curiam)). Such reasonableness exceptions, however, must be narrow and well-delineated in order to retain their constitutional character. *Flippo*, 528 U.S. at 13 (citing *Katz v. United States*, 389 U.S. 347, 357 (1967)). One such exception is when exigent circumstances justify the warrantless entry of a home. *See Mincey v. Arizona*, 437 U.S. 385, 392–94 (1978). The rationale underpinning the exigent circumstances doctrine is that when faced with an immediate and credible threat or danger, it is inherently reasonable to permit police to act without a warrant.

A.

The Supreme Court has recognized a variety of specific circumstances that may constitute an exigency sufficient to justify the warrantless entry and search of private property. These circumstances have included when officers must enter to fight an on-going fire, prevent the destruction of evidence, or continue in "hot pursuit" of a fleeing suspect. *Brigham City*, 547 U.S. at 403 (citing *Michigan v. Tyler*, 436 U.S. 499, 509 (1978); *Ker v. California*, 374 U.S. 23, 40 (1963) (plurality opinion); and *United States v. Santana*, 427 U.S. 38, 42, 43 (1976)). In addition to these well-established exigencies, the Supreme Court and this Circuit have held that more general "emergencies," if enveloped by a sufficient level of urgency, may also constitute an exigency and justify a warrantless entry and search. *See generally*, *Brigham City*, 547 U.S. at 403; *United States v. Hill*, 649 F.3d 258, 265 (4th Cir. 2011).

Under this more general emergency-as-exigency approach, in order for a warrantless search to pass constitutional muster, "the person making entry must have had an objectively reasonable belief that an emergency existed that required immediate entry to render assistance or prevent harm to persons or property within." *United States v. Moss*, 963 F.2d 673, 678 (4th Cir. 1992). An objectively reasonable belief must be based on specific articulable facts and reasonable inferences that could have been drawn therefrom. *See Mora v. City of Gaithersburg*, 519 F.3d 216, 224 (4th Cir. 2008) (citing *Terry v. Ohio*, 392 U.S. 1, 21 (1968)).

Regardless of the particular exigency being invoked, we have repeatedly found the non-exhaustive list of factors first provided in *United States v. Turner*, 650 F.2d 526, 528 (4th Cir. 1981), to be helpful in determining whether an exigency reasonably justified a warrantless search. *Hill*, 649 F.3d at 265. The *Turner* factors include:

(1) the degree of urgency involved and the amount of time necessary to obtain a warrant; (2) the officers' reasonable belief that the contraband is about to be removed or destroyed; (3) the possibility of danger to police guarding the site; (4) information indicating the possessors of the contraband are aware that the police are on their trail; and (5) the ready destructibility of the contraband.

650 F.2d at 528.

We have expanded upon this analytical framework in certain circumstances. In *Mora*, we noted that the same Fourth Amendment principles which give rise to the exigent circumstances justification for a warrantless search — namely the balancing of the governmental interest in a protective search with the individual interests at stake in the intrusion, viewed through the lens of objective reasonableness — also give rise to constitutionally permissible warrantless searches in what we referred to as the "preventive action" context. 19 F.3d at 222. In *Mora*, we determined a warrantless search of a suspect's luggage, van, and apartment was constitutional, based on the overwhelming need to prevent harm to the public where police had received a hotline tip that the suspect was intent on committing mass murder. *Id.* at 225–26. In so doing, we relied on the same Fourth Amendment principles we do here, and emphasized, "[a]s the likelihood, urgency, and magnitude of a threat increase, so does the justification for and scope of police preventive action." *Id.* at 224.

With these principles in mind, we turn to their application in the present case.

B.

The Government argues that the possible threat of a grenade created exigent circumstances that, as in *Mora*, justified the search of Yengel's closet as "preventive action." The dis-

trict court, however, found the objective facts of this case sufficiently distinct from *Mora*, and concluded that no emergency existed, and thus, no exigent circumstances existed, to justify a warrantless search under the guise of preventive action. We agree.

We conclude the objective circumstances discernible at the time Sergeant Staton entered the closet did not constitute an emergency such that a reasonable officer would have believed a preventive entry was warranted. In fact, Sergeant Staton's own actions belie the Government's argument. We find a number of facts highly persuasive.

First, the information available to Sergeant Staton regarding the stable nature of the threat prior to the search indicated that the scope of any danger was quite limited.

Mrs. Yengel informed Sergeant Staton only that there was a "grenade" inside the house, and provided no indication that there might be other, more unstable explosives, inside as well. Mrs. Yengel also provided no indication to Sergeant Staton as to when she had last seen the grenade that could support a conclusion the grenade was somehow "live" or could detonate at any moment.[4] Indeed, even the presence of explosive materials alone, while heightening the danger, would not automatically provide an exigent basis for a search. *See United States v. Bonitz*, 826 F.2d 954, 957 (10th Cir. 1987) (concluding no

---

[4]In fact, as it turned out, Mrs. Yengel had not seen the purported grenade for two years prior to the warrantless entry into the closet. We note that Mrs. Yengel's statement, that she had not seen the grenade in two years, would only further justify our determination that there was no exigency. This statement, however, only appears in Investigator Driscoll's testimony. Investigator Driscoll did not have contact with Mrs. Yengel until after Sergeant Staton's entry and search occurred. There is no indication in the record that Mrs. Yengel informed Sergeant Staton, at the time he entered the closet, that she had not seen the grenade in two years, nor is there any indication that he asked her when she had last seen it. Therefore, we do not rely on this information in reaching our conclusion.

exigency existed where officers found cans of gun powder because "[s]tanding undisturbed, cans of gun powder are inert"). The presence of explosive materials must be tied to objective facts that sufficiently increase the likelihood, urgency, and magnitude of the threat to the level of an emergency. We find no clear error in the district court's factual finding that a grenade is a stable, inert explosive device that typically requires human intervention to detonate and cause harm.

In *Bonitz*, police officers viewed a can of black powder and a grenade-shaped paperweight atop a workbench. *Id*. The Tenth Circuit determined that the presence of these materials, alone, did not create an exigency allowing police officers to conduct a warrantless search of the surrounding room. *Id.* In this case, the Government argues that because the explosive device was not in plain view but rather hidden from view inside a closet, this created a level of uncertainty that was not present in *Bonitz*, and therefore required Sergeant Staton to confirm that there was, in fact, only a grenade present. This speculative rationale is too detached from the objective facts available to Sergeant Staton at the time of the search — specifically that Mrs. Yengel had only told him that a "grenade" was present. Like the Tenth Circuit in *Bonitz*, we conclude that the possible existence of a stable, inert explosive device, without objective facts that increase the threat of danger, does not create an exigency to justify a warrantless search. *Id.* ("Thus, the only immediate danger that existed was created by the officers themselves when they entered the secure area and began to handle these materials.").

Second, the immobile and inaccessible location of the threat further diminished the scope of any possible danger. Mrs. Yengel informed Sergeant Staton that the "grenade" was inside a locked closet — a closet to which neither she, nor anyone else other than Yengel, had ready access. Once Yengel was arrested and removed from the scene, the threat that someone might access the closet and disturb a stable grenade

contained therein dissipated even further. Accordingly, these facts weigh against concluding under the first, second, third, and fifth *Turner* factors that exigent circumstances were present: the facts did not establish a sufficient degree of urgency and an inability to secure a warrant, a reasonable belief that contraband could be removed or destroyed, danger to police guarding the site, or the ready destructibility of contraband. 650 F.2d at 528.

Finally, the fact that no officers on the scene sought to evacuate the nearby residences, or, in particular, to evacuate Mrs. Yengel's young son who was sleeping in the room *directly next to the alleged grenade* provides stark evidence that a reasonable police officer would not — and did not — believe an emergency was on-going, such as would justify a warrantless entry.

In *United States v. Whitehorn*, 813 F.2d 646 (4th Cir. 1987), we agreed with the district court's determination that exigent circumstances did not justify FBI agents' protective bomb sweep where there was "no evidence that anyone was evacuated from the building or warned of the potential danger, or that the agents had otherwise prepared for the risk of an exploding bomb." 813 F.2d at 649 (internal quotation marks omitted). Similarly, the Tenth Circuit in *Bonitz* found the police's failure to evacuate the arrestee's parents before conducting their search equally indicative of the fact that no exigency existed. 826 F.2d at 957 ("[T]he officers made no attempt to remove defendant's parents from the home even though they now have the audacity to claim that the danger was such to threaten a restaurant some distance away."). In noting that Mrs. Yengel's son was not immediately evacuated from the scene, we are cognizant of the principle that "judges should be cautious about second-guessing a police officer's assessment, made on the scene, of the danger presented by a particular situation." *Ryburn v. Huff*, 132 S. Ct. 987, 991–92 (2012). Here, however, as in *Whitehorn*, the objective actions of the officers speak for themselves.

The stable nature of the threat, the immobile and inaccessible location of the threat, and the failure by police officers on site to view the threat as serious enough to warrant evacuation of a nearby child, alone, support our conclusion under the *Turner* factors that no exigency existed in this case.

The Government's argument to the contrary relies heavily on attempting to draw similarities between this case and *Mora*. In *Mora*, we permitted a warrantless search by police of locked containers after the suspect, who had threatened mass murder, had been detained and police officers were faced with the threat of a possible explosive device, hostage, or confederate. We find, however, several important distinctions between this case and *Mora* more compelling.

Key to our holding in *Mora* was that the police officers' arrival at the scene was predicated upon precise, articulable information that the suspect was about to commit mass murder — a crime of extraordinary consequence. Here, police officers were responding to a report of an armed domestic assault, which, although certainly no less deplorable, is not accompanied by the same gravity of harm as a mass killing. The heightened potential in *Mora* for deliberate and massive public harm increased the exigency and distinguishes it from the present case.

Further, in determining the search in *Mora* constitutional, we emphasized:

> [w]hen police arrived at Mora's apartment and handcuffed him, they did not and could not fully know the dimensions of the threat they faced. . . . Mora might have had a bomb—not an unprecedented thing for men in his state of mind. . . . Mora might have taken hostage the girlfriend who, police knew, had recently broken up with him. Or Mora might have had a confederate.

519 F.3d at 226. Thus, in *Mora*, police officers were concerned about unknown variables that could reasonably accompany a threat of mass murder — bombs, accomplices, and hostages — based on the information they had at the time. In particular, police had been unable to locate Mora's ex-girlfriend, and feared that any attempt at mass murder could reasonably involve accomplices or explosives. There is no similar indication here that the domestic assault, in the context of the facts as they unfolded, would carry with it these same dangers. In fact, once Yengel was arrested and Sergeant Staton was informed of the type of explosive thought to be present, and that it was contained in a secure location, the possibility of such unknown threats diminished.

The Government argues other facts available to Sergeant Staton — including the possible existence of a "grenade," the layperson's understanding of explosives, the presence of a high number of firearms, and Yengel's earlier threats to harm police personnel — when coupled with the uncertainty of what lay behind the closet door, supported preventive police action to fully determine the scope of the risk he faced. While we recognize preventive action may well be justified in the face of an exigency, we conclude the factual circumstances of this case simply do not rise to that level. Inevitably, every police interaction with the public will carry with it an apprehension of the unknown; but not every interaction presents an emergency requiring preventive action. Rather, when uncertainty is tethered to objective facts that increase the likelihood, urgency, and magnitude of a threat, an emergency may be present and preventive action may be warranted. Where, as here, however, the objective facts decrease the likelihood, urgency, and magnitude of a threat, any uncertainty is likewise tempered, and the exigency dissipates.

In the end, the Fourth Amendment's ultimate touchstone of objective reasonableness must be our guide. In this case, we conclude the objective facts at the time of the forcible war-

rantless entry into the locked closet were insufficient to justify a reasonable belief that an exigency existed.

## IV.

Accordingly, we agree with the district court's well-reasoned opinion that the degree of urgency, and the other factors established in *United States v. Turner*, 650 F.2d 526, 528 (4th Cir. 1981), did not rise to a level sufficient to create an exigency and warrant the kind of preventive police action we approved in *Mora v. City of Gaithersburg*, 519 F.3d 216 (4th Cir. 2008). We therefore conclude that the warrantless search in this case was unconstitutional, and the evidence gained therefrom rightfully suppressed.

For the aforementioned reasons, the district court's order is

*AFFIRMED*.