**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 18-4233

UNITED STATES OF AMERICA,

Plaintiff – Appellant,

v.

BILLY CURRY, JR.,

Defendant – Appellee.

Appeal from the United States District Court for the Eastern District of Virginia, at Richmond.  M. Hannah Lauck, District Judge.  (3:17-cr-00130-MHL)

Argued:  December 12, 2018                     Decided:  September 5, 2019

Before NIEMEYER, FLOYD, and RICHARDSON, Circuit Judges.

Reversed and remanded by published opinion.  Judge Richardson wrote the majority opinion, in which Judge Niemeyer joined.  Judge Floyd wrote a dissenting opinion.

**ARGUED:**  Richard Daniel Cooke, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellant.  Caroline Swift Platt, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Alexandria, Virginia, for Appellee.  **ON BRIEF:**  G. Zachary Terwilliger, United States Attorney, Alexandria, Virginia, Holli R. Wood, Special Assistant United States Attorney, Michael A. Jagels, Special Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellant.  Geremy C. Kamens, Federal Public Defender, Alexandria, Virginia, Paul G. Gill, Assistant Federal Public Defender, Laura J. Koenig, Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Richmond, Virginia, for

Appellee.

RICHARDSON, Circuit Judge:

While patrolling a residential neighborhood after dark, police officers heard several gunshots close by. They rushed to the scene to find the Defendant, Billy Curry, Jr., and a half dozen other men, walking away from where the shots were fired. The officers shined flashlights on the men and instructed them to stop, raise their hands, and then lift their shirts to expose their waistbands for any concealed weapons. Only Curry failed to comply, leading to a pat down that revealed a silver revolver.

After he was indicted for being a felon in possession of a firearm, Curry moved to suppress the revolver. The district court granted Curry's motion, reasoning that the initial stop and flashlight illumination of the men leaving the site of the shooting violated the Fourth Amendment, which rendered the later pat down illegal. The Government appeals.

The officers here reacted to a perilous active-shooter situation, arriving on scene within 35 seconds of hearing multiple gunshots in a densely populated area. These exigent circumstances implicated vital governmental interests—citizen and police safety—beyond the ordinary need for law enforcement. The officers' initial response was tailored to address these needs with minimal intrusion and thus reasonable. We therefore reverse the district court's conclusion that the brief stop and flashlight search violated the Fourth Amendment. We leave for the district court to consider whether the officers had reasonable suspicion to search Curry after he disregarded their orders.

# I.

## A.    The stop and search

On the night of September 8, 2017, four uniformed officers from the Richmond Police Department's Focus Mission Team—a division dedicated to violent crime and drug suppression—were patrolling the Creighton Court neighborhood in Richmond, Virginia.[1] The officers were assigned to patrol Creighton Court because it had been the site of frequent gun violence, with six shootings and two homicides in the previous three months. The most recent homicide in the neighborhood had occurred just ten days earlier. At around 9:00 PM, the officers heard around a half dozen gunshots coming from the direction of a street called Walcott Place. Two of the officers activated their body cameras, which provide a clear record of what happened. The below satellite image, taken from a Government exhibit, shows the officers' initial location marked as "A." J.A. 124.

---

[1] Neither party disputes the district court's findings of fact, so we recite the operative facts from the district court's opinion. *See* J.A. 255–62. The district court based its factual findings on testimony from Curry's suppression hearing and on video footage from body cameras.



Upon hearing the gunfire, the officers made a U-turn and drove northeast across a field toward Walcott Place. The district court estimated that "the patrol car travelled two to three blocks, taking only thirty-five seconds to arrive behind Walcott Place" at the location marked "B" on the map. J.A. 256–57. In that short time, the officers' radios announced that at least two 911 calls "had come in for random gunfire, one of which was on Walcott Place." J.A. 257. Before stopping, the officers observed a man in a red shirt who "appeared to be maybe favoring one of his arms." *Id.*

As the officers arrived at what they believed to be the site of the shooting (it was likely within 50 yards), they spotted several individuals, including Curry, "walking away from a cut-through from Walcott Place, away from where the gunshots originated." J.A. 258. The officers met Curry at the location marked "C."

5

Using their flashlights, the officers "fanned out and began approaching different individuals," "illuminating the individuals . . . , their waistbands and hands, looking for any handguns or firearms." *Id.* In doing so, the officers stopped the first men encountered leaving the scene, including Curry. The other individuals complied with the officers' directives to lift their shirts and submit to a visual inspection of their waistbands for concealed firearms. Curry refused to fully comply. When officers sought to pat Curry down, a brief scuffle ensued. After Curry was taken to the ground and handcuffed, the officers then recovered a silver revolver from the ground near Curry.

## B.     The district court's suppression order

Curry was indicted for being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). He then moved to suppress the revolver, arguing that the officers violated the Fourth Amendment by stopping and searching him without reasonable suspicion that he was engaged in criminal activity. In response, the Government argued first that the officers did have reasonable suspicion, and, alternatively, that the exigent circumstances at the time of the stop rendered it reasonable without reasonable suspicion.

Following an evidentiary hearing, the district court suppressed the recovered revolver. Applying *Terry v. Ohio*, 392 U.S. 1 (1968), the court determined that the officers lacked reasonable suspicion to justify the brief investigatory stop. The court reasoned that

because the officers "ha[d] no particularized suspicion as to Curry" and were "not attempting to detain only Curry," *Terry* could not support the initial stop. J.A. 274.[2]

In suppressing the revolver, the court also found the surrounding "exigencies" of the situation could not excuse the prerequisite of individualized reasonable suspicion. *See* J.A. 281 ("Despite Officer Gaines's legitimate concern for his own safety and the safety of his partners, the exigencies in this situation cannot undermine the Fourth Circuit's clear holding that 'the Constitution requires a *particularized* and objective basis for suspecting *the particular person stopped* of criminal activity.'" (quoting *United States v. Massenburg*, 654 F.3d 480, 485 (4th Cir. 2011)); J.A. 276 ("Even in these circumstances, with the attendant emergency and safety concerns, the Fourth Amendment allowed the officers only to initiate a consensual encounter, not the *Terry* stop they undertook."). The district court thus held that the initial stop was unlawful and granted Curry's motion without considering whether the officers were later justified in frisking Curry. The Government timely appealed and we have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3731.

## II.

We must decide whether the officers' initial stop of the men leaving Walcott Place was constitutional. *See United States v. Robinson*, 846 F.3d 694, 700 (4th Cir. 2017) (en banc). If not, then the revolver was properly suppressed, and the case is over. If, however,

---

[2] We accept the Government's concession on appeal that the officers lacked reasonable suspicion before undertaking the initial stop. In doing so, we do not address whether and under what circumstances suspicion may arise from being part of a group.

7

the initial stop was lawful, then we will remand to the district court to determine whether the later search of Curry was also lawful. *See id.*

To determine whether the initial stop was lawful, we review the district court's legal conclusions de novo and its findings of fact for clear error. *United States v. Kehoe*, 893 F.3d 232, 237 (4th Cir. 2018); *United States v. Day*, 591 F.3d 679, 682 (4th Cir. 2010). Here, we have both. The district court found that the officers were responding to an emergency and that legitimate safety concerns existed when they encountered the men leaving the shooting, and we review that factual finding for clear error. *United States v. Moses*, 540 F.3d 263, 270 (4th Cir. 2008). Whether those legitimate concerns constituted exigent circumstances that excused the requirement for individualized suspicion calls for a legal conclusion, which we review de novo. *United States v. Singleton*, 441 F.3d 290, 293 (4th Cir. 2006).

## A.     The governing Fourth Amendment principles

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV. As the first clause makes plain, the "touchstone" of any Fourth Amendment analysis is "the reasonableness in all circumstances of the particular governmental invasion of the citizen's personal security." *Pennsylvania v. Mimms*, 434 U.S. 106, 108–09 (1977); *see also United States v. McCoy*, 513 F.3d 405, 410 (4th Cir.

8

2008) ("As is obvious from the constitutional text, the central inquiry under the Fourth Amendment is reasonableness.").[3]

This touchstone inquiry of reasonableness requires determining whether the government's interest in undertaking a search or seizure "outweigh[s] the degree to which the search [or seizure] invades an individual's legitimate expectations of privacy." *Maryland v. King*, 569 U.S. 435, 461 (2013); *see also Camara v. Municipal Court*, 387 U.S. 523, 536–37 (1967) (evaluating a warrantless governmental intrusion for reasonableness requires "balancing the need to search against the invasion which the search entails"). And this balance "depends on the context within which a search takes place." *New Jersey v. T.L.O.*, 469 U.S. 325, 337 (1985).

Depending on the context, law enforcement officers often need some suspicion of criminal activity to reasonably search or seize an individual. For example, a vehicle may be stopped if officers reasonably suspect the driver committed a traffic violation. *United States v. Kellam*, 568 F.3d 125, 136 (4th Cir. 2009). Once the vehicle is stopped, an occupant may be frisked for weapons if officers reasonably suspect the occupant is armed

---

[3] The second portion of the Fourth Amendment, the Warrant Clause, limits the issuance of warrants. It does not itself require a warrant before performing every search or seizure. No warrant is required for certain arrests, *United States v. Watson*, 423 U.S. 411, 424 (1976), to search a vehicle, *United States v. Ross*, 456 U.S. 798, 809 (1982), or to search an individual in public spaces, *United States v. Arvizu*, 534 U.S. 266, 273 (2002). Even the warrantless search of a home may be justified by governmental interests: for example, protective sweeps, *Maryland v. Buie*, 494 U.S. 325, 335 (1990); community caretaking, *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973); the supervision of probationers, *Griffin v. Wisconsin*, 483 U.S. 868, 873–75 (1987); or exigent circumstances, *Mincey v. Arizona*, 437 U.S. 385, 394 (1978). Curry does not argue here that the officers needed to obtain a warrant.

and dangerous. *United States v. George*, 732 F.3d 296, 299–302 (4th Cir. 2013). And the vehicle itself may be searched if officers have, or develop, probable cause to believe the vehicle contains evidence of criminal activity. *Ross*, 456 U.S. at 820–21.

Even without suspicion of criminal activity, a search or seizure may still be reasonable when "special governmental needs, beyond the normal need for law enforcement" justify the intrusion. *National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 665 (1989) (noting the "longstanding principle that neither a warrant nor probable cause, nor, indeed, any measure of individualized suspicion, is an indispensable component of reasonableness"). For "the Fourth Amendment imposes no irreducible requirement of such suspicion." *T.L.O.*, 469 U.S. at 342 n.8 (quoting *United States v. Martinez-Fuerte*, 428 U.S. 543, 560–561 (1976)).

Not just any governmental interest will do. Only "limited circumstances" can justify a search or seizure without reasonable suspicion. *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 624 (1989) (noting that "[i]n limited circumstances, where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search may be reasonable despite the absence of such suspicion"). The interest at issue must go beyond "ordinary crime control" to qualify as a special need—as do, for instance, the government's interests in "thwart[ing] an imminent terrorist attack" and "catch[ing] a dangerous criminal." *City of Indianapolis v. Edmond*, 531 U.S. 32, 44 (2000).

As these examples show, however, an interest qualifying as a "special need" can overlap with the interest in crime control, and it usually does. *See id.* (recognizing that circumstances may justify a suspicionless seizure where "the primary purpose would otherwise, *but for some emergency*, relate to ordinary crime control" (emphasis added)). Thus, searches without reasonable suspicion have been authorized to detect the use of alcohol and drugs among drivers, train operators, and certain public officials. *See Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 455 (1990); *Skinner*, 489 U.S. at 624; *Von Raab*, 489 U.S. at 666; *Carroll v. City of Westminster*, 233 F.3d 208, 212 (4th Cir. 2000). The government's interest in protecting the public from the harms that result from irresponsible use of drugs and alcohol is cognizable as a special need, even though it overlaps substantially with the government's interest in detecting and deterring criminal use of drugs and alcohol. Similarly, the government's interest in supervising probationers is a cognizable special need, even though it overlaps with the government's interest in investigating criminal activity by those probationers. *Griffin*, 483 U.S. at 875

When faced with often-overlapping interests, we must ask whether the *primary* objective of the search or seizure was to generate evidence for law enforcement purposes or to serve a need beyond the normal need for law enforcement. *See Ferguson v. City of Charleston*, 532 U.S. 67, 81–85 (2001). That inquiry focuses on the "immediate" purpose when the search or seizure was undertaken and not some "ultimate" purpose. *Id.* at 82–83. Thus in *Ferguson*, the Court distinguished between an immediate purpose of gathering evidence to prosecute addicted mothers and an ultimate purpose of protecting the health of children and mothers by getting mothers to stop using drugs through the threat of

prosecution. *Id.* at 83–84 ("The threat of law enforcement may ultimately have been intended as a means to an end [*i.e.*, health of children and mothers], but the direct and primary purpose of [the hospital's] policy was to ensure the use of those means. In our opinion, this distinction is critical."). To identify this primary purpose, courts must consider all the circumstances surrounding the search or seizure. *Id.* at 81; *cf. Michigan v. Bryant*, 562 U.S. 344 (2011) (identifying the "primary purpose" of a statement to police to determine whether the statement is testimonial under the Confrontation Clause).

B.   **The government's interest in responding to the shooting and preventing violence represented a special need.**

In this case, the officers heard shots fired and, seconds later, responded to the scene of the shooting. We must decide whether this situation gave rise to a special need that could justify this limited search and seizure without individualized suspicion. We conclude that it did.[4]

---

[4] As the Supreme Court explained in *Edmond*, exigent circumstances may serve as a special need. *Edmond*, 531 U.S. at 44 (noting that, while the general interest in crime control will not suffice, the need to "thwart an imminent terrorist attack or to catch a dangerous criminal who is likely to flee by way of a particular route" may constitute a special need suspending "the usual requirement of individualized suspicion"); *cf. Carpenter v. United States*, 138 S. Ct. 2206, 2223 (2018) (noting that "the need to pursue a fleeing suspect, protect individuals who are threatened with imminent harm, or prevent the imminent destruction of evidence" represent "exigencies" that may support a warrantless search or seizure). Using these frameworks helps answer the actual question of whether the actions taken were reasonable. And that requires consideration of all the circumstances, including the exigency of the situation; the government's need to act; the effect of the action on the government's need; and the severity of the infringement on the affected person's liberty.

12

One governmental special need is the interest in responding to "exigent circumstances." *See United States v. Taylor*, 624 F.3d 626, 631 (4th Cir. 2010). The exigent-circumstances doctrine recognizes that "'[t]he need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.'" *Mincey*, 437 U.S. at 392–93 (quoting *Wayne v. United States*, 318 F.2d 205, 212 (D.C. Cir. 1963) (Burger, J.)). For example, in *Taylor* we found that officers needed no probable cause (nor a warrant) to enter a home lawfully. 624 F.3d at 632–33. The intrusion was reasonable based on the exigent circumstances posed when officers found an unsupervised child on a roadway and feared for the parents' safety when no one responded at the child's home. *Id.*; *see also Hunsberger v. Wood*, 570 F.3d 546, 555–56 (4th Cir. 2009).

In several cases, we have permitted seizures outside the home without reasonable suspicion of criminal activity based on exigent circumstances beyond the normal need for law enforcement. For example, in *United States v. Harper*, this Court relied on the "exigency of fleeing, perhaps dangerous, suspects" to approve stops without individualized suspicion "of all persons found on a likely access route" three miles away from a scheduled drug-delivery at a dock that had been raided hours earlier. 617 F.2d 35, 40–41 (4th Cir. 1980). And in *Figg v. Schroeder*, we permitted the suspicionless seizure and detention of several individuals based on the reasonable belief that "police officers engaged in lawful investigatory functions would be endangered" without the seizures. 312 F.3d 625, 639–40 (4th Cir. 2002).

13

Other courts have reached similar conclusions. As noted above, the Supreme Court in *Edmond* suggested that roadway searches without reasonable suspicion could be justified by the important governmental interests presented by "an imminent terrorist attack" or "a dangerous criminal who is likely to flee by way of a particular route," unlike impermissible roadblocks whose primary purpose is general crime control. 531 U.S. at 44; *see also United States v. Paetsch*, 782 F.3d 1162 (10th Cir. 2015) (holding that a police barricade of 20 vehicles for 29 minutes occurring roughly 14 minutes after an armed bank robbery did not violate the Fourth Amendment).[5] Relatedly, our sister circuits have held that the need to prevent terrorist attacks permits searches without individualized suspicion in subways and airports. *See McWade v. Kelly*, 460 F.3d 260, 268–69 (2d Cir. 2006); *United States v. Hartwell*, 436 F.3d 174, 179 (3d Cir. 2006).[6]

---

[5] The district court's opinion could be read to suggest that exigent circumstances may never justify any suspicionless seizure. *See, e.g.*, J.A. 263, 281. Given our cases and the Supreme Court's pronouncements, Curry wisely abandons this theory, *see* Oral Argument 25:40–26:50, and agrees that exigent circumstances could, in an appropriate case, permit a suspicionless seizure. *See generally Samson v. California*, 547 U.S. 843, 855 n.4 (2006) ("The touchstone of the Fourth Amendment is *reasonableness*, not individual suspicion."); *Skinner*, 489 U.S. at 624 ("[A] showing of individualized suspicion is not a constitutional floor, below which a search must be presumed unreasonable.").

[6] Acknowledging the relevance of the seriousness of the crime, Justice Jackson once described the type of emergency that might render a suspicionless search reasonable:

> If we assume, for example, that a child is kidnap[p]ed and the officers throw a roadblock about the neighborhood and search every outgoing car, it would be a drastic and undiscriminating use of the search. The officers might be unable to show probable cause for searching any particular car. However, I should candidly strive hard to sustain such an action, executed fairly and in good faith, because it might be reasonable to subject travelers to that

(Continued)

What constitutes "exigent circumstances" to justify warrantless or suspicionless seizures is highly fact-specific. Exigent circumstances exist where the objective circumstances would lead a reasonable, experienced officer to believe an urgent need existed to act, particularly where the safety of the public or police are threatened. *See Minnesota v. Olson*, 495 U.S. 91, 100 (1990). As the Supreme Court has explained, these exigencies include "the need to pursue a fleeing suspect, protect individuals who are threatened with imminent harm, or prevent the imminent destruction of evidence." *Carpenter*, 138 S. Ct. at 2222–23. And "[i]n addition to these well-established exigencies, the Supreme Court and this Circuit have held that more general 'emergencies,' if enveloped by a sufficient level of urgency, may also constitute an exigency." *United States v. Yengel*, 711 F.3d 392, 397 (4th Cir. 2013); *see also Taylor*, 624 F.3d at 631–33 (finding abandoned child on street constituted an exigent circumstance given "the self-evident danger that the abandoned child posed to herself and the inference of danger to her caretaker").

Here, we, like the district court, have little difficulty concluding that the officers faced exigent circumstances. *See* J.A. 281 (recognizing the "exigencies" of "Officer Gaines's legitimate concern for his own safety and the safety of his partners"); *see also* J.A. 276. The officers were not investigating a shooting that occurred days or even hours earlier. They were rushing to respond to shots fired just *seconds* earlier in a densely

indignity if it was the only way to save a threatened life and detect a vicious crime.

*Brinegar v. United States*, 338 U.S. 160, 183 (1949) (Jackson, J., dissenting).

15

populated residential neighborhood. That presented the officers with the prospect that a single, active shooter might continue to threaten the safety of the public (not to mention the officers themselves), as well as the prospect of retaliation from other shooters (a distinct possibility given that the area was known for gun violence). The immediate purpose of the stop and flashlight search was the need to protect the public and the officers from these dangers. Even though one purpose of the officer's actions that night may have included ordinary law enforcement, the immediate objective of their stopping these individuals puts this case squarely within the special-needs doctrine.

### C. The initial stop and flashlight search was reasonable given the exigent circumstances.

Identifying a special government need, such as exigent circumstances, is only one aspect of evaluating a search or seizure conducted without individualized suspicion. That intrusion must still be evaluated for reasonableness under the balancing test of *Brown v. Texas*, 443 U.S. 47 (1979). *See Sitz*, 496 U.S. at 455; *McWade*, 460 F.3d at 268–69; *Hartwell*, 436 F.3d at 179.[7] Under *Brown*, we balance (1) the gravity of the public concerns

---

[7] Though the identification of a special need tilts the balancing of a suspicionless search in favor of reasonableness, the Supreme Court has never found such a need to be a necessary precondition to balancing. *See Samson*, 547 U.S. at 855 n.4 (observing that "although this Court has only sanctioned suspicionless searches in limited circumstances, namely, programmatic and special needs searches, we have never held that these are the only limited circumstances in which searches absent individualized suspicion could be 'reasonable' under the Fourth Amendment").

served by the seizure, (2) the degree to which the seizure advanced those concerns, and (3) the severity of the interference with the individual's liberty. 443 U.S. at 50–51.[8]

We conclude that these exigent circumstances implicated important public concerns far beyond general crime control. The officers' actions advanced those interests by ordering the men to stop and submit to an unobtrusive flashlight search of their waistbands to identify weapons. This intrusion on the men's liberty was minimal in both scope and duration. On balance, the initial stop was reasonable.

### 1. The public concerns were grave.

First, we weigh the public concerns present when the officers seized Curry and the other men leaving the scene of the shooting. As the district court summarized, all four officers heard five or six gunshots coming from "the direction of Walcott Place." J.A. 256. The officers' suspicions were proven correct when, as they drove toward the shooting location, they learned of two 911 calls reporting gunfire in Creighton Court, with one call confirming the shooting location as Walcott Place. And seconds before stopping, the officers observed a man they believed to be "favoring one of his arms," as if shot. J.A.

---

[8] In *Vernonia School District 47J v. Acton*, 515 U.S. 646 (1995), the Court upheld mandatory drug testing using this balancing test based on the government's special needs. *Id.* at 652–53. In doing so, the Court noted that "there was no clear practice, either approving or disapproving the type of search at issue, at the time the constitutional provision was enacted." *Id.* at 652 n.1. As the parties have not argued that historical sources shed light on the Supreme Court's special-needs jurisprudence, we do not address them here. *Cf.* Orin S. Kerr, *An Equilibrium-Adjustment Theory of the Fourth Amendment*, 125 HARV. L. REV. 476, 496 (2011) (noting that in its special-needs cases, "the Supreme Court is guided by a balancing approach of reasonableness, and that reasonableness reflects a contemporary policy judgment rather than an effort to reach some prior equilibrium").

These undisputed facts point to the important and urgent public concerns of public safety and police safety.

The first and chief concern present that evening was that of public safety, which we have recognized as "the first job of any government." *Mora v. City of Gaithersburg*, 519 F.3d 216, 223 (4th Cir. 2008).[9] These officers heard a half-dozen gunshots in a neighborhood "where hundreds of families live." J.A. 256. This provided an objective evidentiary justification for this strong government interest—calling for first responders to prevent any further shootings (either as retaliation or a continuation of the opening salvo) and treat wounded citizens on the scene. *See Florida v. J.L.*, 529 U.S. 266, 272 (2000) (recognizing "the serious threat that armed criminals pose to public safety").[10]

These facts also raise concerns for police-officer safety, which the Supreme Court has called "both legitimate and weighty." *Mimms*, 434 U.S. at 110. This interest is implicated whenever an officer conducts an investigatory stop. *Robinson*, 846 F.3d at 698

---

[9] Again, the government's special interest in protecting the public safety from exigent threats is distinct from the government's generalized interest in "ordinary crime control," even if they sometimes overlap. *See supra*, at 10–11; *see also Delaware v. Prouse*, 440 U.S. 648, 659 n.18 (1979); *City of Indianapolis v. Edmond*, 531 U.S. 32, 44 (2000). To distinguish between the two, we must examine the threatened harm's (1) immediacy, (2) likelihood, and (3) magnitude. *See Mora v. City of Gaithersburg*, 519 F.3d 216, 224–25 (4th Cir. 2008).

[10] Recall also that the officers were patrolling the area that night in response to public concerns about gun violence, including six recent shootings. This fact alone does not begin to justify a suspicionless stop. But it is "among the relevant contextual considerations" in a Fourth Amendment analysis. *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). And here, that context lends credibility to the Government's argument that the officers had reason to believe that the individuals encountered might be armed.

18

(noting that "the Supreme Court has repeatedly recognized that whenever police officers use their authority to effect a stop, they subject themselves to a risk of harm"). But where gunfire has already erupted, as it had here, the concern that an officer might be harmed is particularly acute.[11]

The immediacy and certainty of the threat distinguish this case from *Massenburg*, which the district court relied on heavily in finding the initial stop unlawful. In *Massenburg*, the time that elapsed between the shooting and the arrival of law enforcement was 15 minutes—far greater than the 35 seconds here. 654 F.3d at 482–83. And the police officers in *Massenburg* encountered the defendant and his companions roughly four blocks from the reported shooting location, while the officers here reasonably thought they were at the very scene of the shooting. *Id.* What is more, unlike the officers in *Massenburg*— who had only an uncorroborated, anonymous, and (as it turned out) false report of a shooting—the officers here personally heard the gunfire. *Id.* It is thus unsurprising that the government did not even attempt to rely on exigent circumstances in *Massenburg*.

---

[11] On top of the grave safety concerns, the public also has a lesser interest in preserving and collecting any dissipating evidence of a recent crime. *See Illinois v. McArthur*, 531 U.S. 326, 331–332 (2001). This was not a situation in which officers conducted an intrusive search for evidence days later based solely on the seriousness of the crime. *Cf. Mincey*, 437 U.S. at 393. Rather, the officers' response was near-immediate. The government therefore had some interest in preserving physical evidence and obtaining information from witnesses. *See Birchfield v. North Dakota*, 136 S. Ct. 2160, 2182 (2016); *Illinois v. Lidster*, 540 U.S. 419, 423 (2004).

## 2.    The limited seizure advanced the public concerns.

We next analyze how much the seizure advanced the grave public concerns of citizen and police safety. *Brown*, 443 U.S. at 50–51. Here, the officers' actions were tailored to address this active-shooter scenario. In responding to a situation that involved at least one armed gunman, the officers donned flashlights and spread out, illuminating "waistbands and hands, looking for any handguns or firearms." J.A. 258. In doing so, the officers ordered the men to lift their shirts, expose their waistbands, and turn around.

We find that these actions were targeted to address the urgent public concerns of citizen and police safety present when the officers encountered Curry and the other men leaving Walcott Place. *See Edmond*, 531 U.S. at 44. It simply "does not meet the needs of law enforcement or the demands of public safety to require officers to walk away from a situation like the one they encountered here." *Michigan v. Fisher*, 558 U.S. 45, 49 (2009); *see also United States v. Perkins*, 363 F.3d 317, 328 (4th Cir. 2004) ("We cannot afford to read the Fourth Amendment to require officers to wait . . . , perhaps until innocent bystanders are physically harmed, before taking reasonable, preventive measures."). And the officers had no effective alternatives to address the safety concerns.

Even so, Curry argues that the officers' response failed to advance a legitimate public interest because they had no way of knowing whether those responsible for the shooting were travelling in that direction. According to Curry, this lack of certainty distinguishes this stop from the seizure found lawful by the Second Circuit in *Palacios v. Burge*, 589 F.3d 556 (2d Cir. 2009), where police officers sealed the exits to a club hoping to identify a group of men who ran into the club after being involved in a stabbing. The

20

district court agreed on this point, observing that in *Palacios* "the officers could be nearly certain that the individual or individuals responsible for the stabbing were inside the club." J.A. 279. But here, the district court noted, the shooter could have escaped by fleeing to the north, and in fact, "several people were standing near the apartment buildings" but were not searched by the officers. J.A. 257.

The district court erred in requiring officers to be sure that one of those stopped was the shooter. Near certainty that a criminal is using a route as a means of egress is not required to stop individuals traveling that route. *See Harper*, 617 F.2d at 40–41 (finding reasonable a suspicionless search on a road after "[a] serious crime had been committed involving numerous participants, some of whom were known to be fleeing the scene along a route *reasonably expected* to be used for their escape" (emphasis added)); *see also Edmond*, 531 U.S. at 44.[12] Instead, only a "reasonabl[e] expect[ation]" is required. *Harper*, 617 F.2d at 41. And that was present here. To begin with, the officers reasonably identified where the shooting had broken out, relying on their own perceptions, dispatch reports, and seeing someone who appeared to be a wounded victim. Given these officers'

---

[12] At argument, Curry conceded that certainty of capture was not a prerequisite for a reasonable search conducted without individualized suspicion in response to gunfire. Indeed, in cases evaluating suspicionless government checkpoints serving special government needs, the Supreme Court has considered efficacy under the second *Brown* factor according to what percentage of total seizures uncovered wrongdoing. The Court has upheld such seizures even where the efficacy of identifying wrongdoers was far below 100%. *See, e.g.*, *Sitz*, 496 U.S. at 455 (finding an arrest rate of 1.6% at a sobriety checkpoint to be effective); *Martinez-Fuerte*, 428 U.S. at 554 (finding a checkpoint identifying illegal aliens in 0.12% of vehicles to be effective).

21

near-immediate response time, the shooter could not have gotten far. Requiring perfect confidence would ignore the exigent circumstances the officers faced: they were trying to prevent anyone from being shot.[13] It would also risk ignoring the uncertainties and dangers in police work and substituting our judgment for those of experienced officers. Fortunately, the Fourth Amendment does not require that result here.

To be sure, the officers did not locate the shooter (who may have fled by another route or discarded his weapon before the officers arrived). Yet we only know that in hindsight, and we may not serve as Monday-morning quarterbacks. *See Graham v. Connor*, 490 U.S. 386, 396 (1989) (noting that reasonableness under the Fourth Amendment "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight"). Our analysis turns on the "facts known to the officers" at the time of the seizure. *Alabama v. White*, 496 U.S. 325, 330 (1990). The officers' split-second decision to briefly stop the first individuals encountered taking that route effectively advanced the public concerns present.

### 3. The limited seizure only slightly interfered with individual liberty.

The final *Brown* factor requires us to assess the severity of the interference with the men's individual liberty. Our review of the record reveals that the intrusion here was minimal in both time and scope. First, the initial flashlight searches took less than a minute

---

[13] Additionally, since these men were the first the officers encountered upon entering the scene, it cannot be said that this brief seizure was selective, haphazard, or arbitrary, nor can we properly draw from this record any conclusions about who else law enforcement investigated (or failed to investigate) afterwards.

for the men who complied. Thus, the duration of the initial stop was "no longer than reasonably necessary for the police, acting with diligence" to address the threat. *McArthur*, 531 U.S. at 332. Second, though the requirement to lift their shirts and be subject to a flashlight search was an intrusion, it is hard to imagine a less intrusive method to determine whether the men were armed.

Moreover, all the searches—of Curry and the other men the officers encountered—took place close in time and proximity to the shooting. The officers searched the first men they came across at what they thought was the scene of the shooting, just after it had happened. The officers "did not conduct a general exploratory search for whatever evidence of criminal activity [they] might find." *Terry*, 392 U.S. at 30. Thus, we find that the intrusion of the initial stop was minimal.

In sum, given the important public interests of citizen and police safety at issue and the limited stop and search that was narrowly circumscribed by the exigencies present, we find the officers' initial stop and flashlight search of Curry and the other men to be reasonable, and thus lawful under the Fourth Amendment. [14]

---

[14] The dissent worries that our reasoning will give officers *carte blanche* to respond however they wish to potentially exigent circumstances. *See* Dissent at 35–36. We disagree.

First, the dissent is not correct that our decision today authorizes police to "enter homes in the general vicinity" of "what[ever] they perceive to be gunfire." *Id.* at 35–36. Nothing in our opinion sanctions this result. As we have emphasized, mere "perception" of an exigency is not enough—that perception must be objectively reasonable based on the particular facts at hand. *Supra*, at 18. In addition, the scope of any search or seizure must also be appropriately limited, *see supra*, at 20–22, meaning police could not search multiple homes willy-nilly. But perhaps most importantly, and as we have just explained, the severity of the intrusion must be justified by the nature and seriousness of the exigency. (Continued)

23

* * *

The police officers here reacted quickly in the face of danger of an active shooter with a measured response tailored to address the very real threat of further violence. Their decision to briefly stop and flashlight search some men leaving the scene of the shooting was reasonable. We therefore reverse the district court's conclusion that the initial stop was unlawful and remand for the district court to determine whether the totality of the circumstances, known before the initial stop and learned during the stop, supported reasonable suspicion that Curry may have been armed as to justify the frisk. *See Robinson*, 846 F.3d at 700; *United States v. Mayo*, 361 F.3d 802, 805–06 (4th Cir. 2004). Accordingly, the judgment of the district court is

*REVERSED AND REMANDED*.

---

Intrusions into the home infringe on privacy and liberty interests at the core of the Fourth Amendment. More would be required to justify the search of even one home—much less multiple homes—than to justify having a few men briefly lift up their shirts.

Nor is the dissent correct that our reasoning will allow police, upon hearing actual (or perceived) gunshots, "to stop and frisk anyone in the area without individualized suspicion." Dissent at 36. Again, our holding today is narrowly based on the confluence of several factors: the severity of the threat (the presence of *multiple* gunshots that were reasonably perceived as such); the tailored nature of the officers' response, which was limited both in time (seconds later) and space (right next to what the officers reasonably believed was the scene of the shooting); and the minimal severity of the intrusion (which did not involve even a frisk of each man, but simply a visual inspection of his waistband). The reasonableness of this analysis is necessarily particular to each case. Thus, the mere perception of gunshots does not automatically authorize police to conduct an unbounded dragnet and frisk everyone in sight.

24

FLOYD, Circuit Judge, dissenting:

I disagree with my colleagues in the majority that exigent circumstances justified the suspicionless seizure in this case. Accordingly, I would affirm the district court's well-reasoned opinion.

Any Fourth Amendment analysis turns on the totality of the circumstances and must, therefore, be grounded on an accurate understanding of the facts. From reading the majority opinion, one might get the impression that upon hearing shots, officers immediately rushed to the scene of a shooting and seized the people there. But this summary glosses over some inconvenient complications. The officers were patrolling a densely populated, high-crime area when they heard what they thought were gunshots. They began driving through a field toward the shots, taking about 35 seconds to arrive behind Walcott Place, where they thought the shots originated. Behind the complex was an open and poorly lit field flanked on two sides by apartment buildings. Approximately five to eight men were walking in and around the field, heading away from the complex where the shots were fired. Several other people were standing near the apartment buildings. None of the men shown in the body camera footage taken that night were walking alongside one another or talking to one another as they moved away from the complex.

As the officers stepped out of the car, they received dispatch calls corroborating that gunfire had come from in or near Walcott Place, but they did not receive a suspect description. The officers exited the car, fanned out, and began approaching different

25

individuals.  The officers stopped some of the individuals walking away from the complex and illuminated their waistbands and hands.

Accordingly, though the officers heard shots, moved toward them, and received corroboration regarding the general location of the shots in or near an apartment complex, the officers did not have any specific description of the scene of the shooting or the perpetrator.  It is also clear that the officers did not stop everyone close to the scene, akin to a checkpoint.  Indeed, the officers did not seize the people closest to the reported location of the shots.  These facts inform the Fourth Amendment analysis and affect the applicability of the exigent circumstances exception.

Notably, the exigent circumstances exception, like all such exceptions, "must be narrow and well-delineated to retain [its] constitutional character." *United States v. Yengel*, 711 F.3d 392, 396 (4th Cir. 2013).  Yet the majority's analysis blurs the lines that have heretofore defined the exigent circumstances exception, conflating exigent circumstances with the special needs exception.  In doing so, the majority goes astray.  Special needs and exigent circumstances are separate doctrines of Fourth Amendment jurisprudence animated by very different concerns and applied in different contexts.[1]

---

[1] Indeed, none of the cases cited by the majority frames the exigent circumstances exception as a subcategory of the special needs exception or analyzes an exigent circumstances claim in terms of the primary purpose of the search.  Our sister circuits have likewise treated the two exceptions as distinct.  *See, e.g., Doe v. Woodard*, 912 F.3d 1278, 1290–91 (10th Cir. 2019) (holding that because a warrantless search was not justified by consent or exigent circumstances, the court must look to whether the special needs exception applies); *Southerland v. City of New York*, 680 F.3d 127, 159 (2d Cir. 2012) (analyzing "special needs" and "exigent circumstances" exceptions separately in  Fourth Amendment challenge to removal of children from their home, holding that "elimination (Continued)

26

The special needs exception arises when "special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." *Bd. of Educ. Of Indep. Sch. Dist. No. 92 of Pottawatomie Cty. v. Earls*, 536 U.S. 822, 830 (2002) (internal quotation marks omitted). The label applies to programmatic searches—such as vehicular checkpoints, random drug tests, and administrative searches—that fall outside the realm of ordinary crime control. The unique motives and contexts of these searches render adherence to the warrant and probable cause requirements impracticable. *See generally Bd. of Educ. v. Earls,* 536 U.S. 822 (2002) (involving a program that subjected all students participating in extracurricular activities to submit to random, suspicionless drug testing); *Ferguson v. City of Charleston,* 532 U.S. 67 (2001) (involving a public hospital's non-consensual drug testing of maternity patients); *Michigan Dept. of State Police v. Sitz*, 496 U.S. 444 (1990) (involving a highway checkpoint program); *Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602 (1989) (involving compulsory blood and urine tests of railroad employees involved in certain train accidents); *Camara v. Municipal Court of City and County of San Francisco*, 387 U.S. 523 (1967) (involving warrantless administrative inspection to ensure compliance with city housing code); *Griffin v. Wisconsin*, 483 U.S. 868 (1987) (involving a probation officer's search of a probationer's home).[2] In all special needs cases, the lynchpin of the court's

---

of a possible 'special needs' approach leaves either the probable-cause or exigent-circumstances standard").

[2] The treatment of parolee and probationer searches aptly illustrates how the special needs analysis is limited to programmatic searches rather than searches conducted by law (Continued)

27

inquiry is whether it is impracticable to require a warrant in light of the primary purpose of a programmatic search. *See City of Indianapolis v. Edmond,* 531 U.S. 32, 41–42 (2000) ("Because the primary purpose of the Indianapolis narcotics checkpoint program is to uncover evidence of ordinary criminal wrongdoing, the program contravenes the Fourth Amendment.").

By contrast, the focus of the exigent circumstances exception is not the *purpose* of the search, but the events giving rise to it.[3] *See Birchfield v. North Dakota*, 136 S. Ct. 2160, 2173 (2016) ("[T]he exigent circumstances exception allows a warrantless search when an emergency leaves police insufficient time to seek a warrant."). "It permits, for instance, the warrantless entry of private property when there is a need to provide urgent aid to those inside, when police are in hot pursuit of a fleeing suspect, and when police fear the imminent destruction of evidence." *Id*. To determine whether a given emergency

---

enforcement officers in the field. The Supreme Court has declined to invoke the special needs doctrine when analyzing parolee or probationer searches conducted by a law enforcement officer rather than a probation or parole officer. *Compare United States v. Knights*, 534 U.S. 112, 122 (2001) (analyzing law enforcement officer's search of probationer under "ordinary Fourth Amendment analysis" and declining to invoke the "limited exception" of special needs) *with Griffin*, 483 U.S. at 879–80 (holding that special needs exception allows a probation officer to search probationer based on reasonable suspicion because requiring probable cause would disrupt the "continuing probation relationship" and impede the probation agency's ability to monitor its charges).

[3] The distinction between the exigent circumstances and special needs exceptions is comparable to what we have deemed the "different intellectual underpinnings" of the exigent circumstances and community caretaking exceptions. *See Hunsberger v. Wood*, 570 F.3d 546, 554 (4th Cir. 2009) (internal quotation marks omitted). "The community caretaking doctrine requires a court to look at the *function* performed by a police officer, while the emergency exception requires an analysis of the *circumstances* to determine whether an emergency requiring immediate action existed." *Id.*

28

justifies officers bypassing a Fourth Amendment protection, courts look to officers' "objectively reasonable belief . . . based on specific articulable facts and reasonable inferences that could have been drawn therefrom." *Yengel*, 711 F.3d at 397.

The exigent circumstances exception does not fit within the framework of a special needs analysis. After all, preservation of evidence and hot pursuit of a fleeing suspect fall squarely within the realm of "ordinary crime control," but both are well-known examples of exigent circumstances that may implicate the exception. *See, e.g., United States v. Santana*, 427 U.S. 38 (1976) (hot pursuit); *United States v. Turner*, 650 F.2d 526 (4th Cir. 1981) (imminent destruction of evidence). Indeed, in the context of an investigatory seizure like the one at issue here, a special needs analysis based on the seizure's primary purpose is untenable.

As noted, the special needs analysis focuses on whether the *programmatic* purpose of a search or seizure falls outside the ordinary realm of crime control; thus, the searching officer's motives are irrelevant. *See Edmond*, 531 U.S. at 48 ("[W]e caution that the purpose inquiry in this context is to be conducted only at the programmatic level and is not an invitation to probe the minds of individual officers acting at the scene."). This makes sense because the special needs exception applies to searches conducted pursuant to certain government programs or policies that render the warrant and probable cause requirements unworkable, not to searches conducted by law enforcement officers in the field. *See Ferguson*, 532 U.S. at 88 (Kennedy, J., concurring) ("None of our special needs precedents has sanctioned the routine inclusion of law enforcement . . . to implement the system designed for the special needs objectives."). Indeed, it is well-established that the

29

subjective motives of the searching officer have no bearing on the reasonableness of a search. *See Whren v. United States*, 517 U.S. 806, 813 (1996) ("[W]e have been unwilling to entertain Fourth Amendment challenges based on the actual motivations of individual officers[.]"). But under the majority's analysis, the Court has no choice but to "probe the minds of the individual officers acting at the scene": the officers here were on patrol responding to a suspected crime, not acting pursuant to a checkpoint or other programmatic search. *See Edmond*, 531 U.S. at 48. Indeed, few ventures fall more squarely within the realm of ordinary crime control, and thus outside the realm of the special needs exception, than officers patrolling a purportedly dangerous area to detect and combat crime.

Ignoring this contradiction, the majority attempts to discern whether the individual officers who stopped Curry did so with the primary purpose of safety or of crime control, insisting that if they acted primarily in service of the former, the special needs exception applies. This creates a dangerous and unworkable application of the special needs doctrine, as safety and ordinary crime control are not readily distinguishable aims when an officer conducts an investigatory seizure while on patrol. *See United States v. Branch*, 537 F.3d 328, 340 (4th Cir. 2008) ("Allowing subjective challenges to police action would risk turning nearly all seizures into speculative inquiries into often unfathomable human motive."). Like *any* investigatory search or seizure conducted when police respond to a suspected crime, Curry's stop was conducted with the safety of both the officers and the public in mind. But if that alone could invoke a Fourth Amendment exception and eliminate the individualized suspicion requirement, then the requirement would be rendered moot.

Applying the special needs doctrine under the circumstances of this case is especially dangerous considering that the officers selectively stopped and frisked certain individuals while not seizing others who were closer to the suspected scene of the shooting. In special needs cases, absent individualized suspicion, the Supreme Court has long insisted upon programmatic safeguards designed to protect against a law enforcement officer's arbitrary use of unfettered discretion. *See, e.g.*, *Maryland v. King*, 569 U.S. 435, 447 (2013) ("The need for a warrant is perhaps least when the search involves no discretion that could properly be limited by the 'interpo[lation of] a neutral magistrate between the citizen and the law enforcement officer.'") (quoting *Treasury Employees v. Von Raab*, 489 U.S. 656, 667 (1989)); *Delaware v. Prouse*, 440 U.S. 648, 654–655 (1979) (holding that where a special need "precludes insistence upon 'some quantum of individualized suspicion,' other safeguards are generally relied upon to assure that the individual's reasonable expectation of privacy is not 'subject to the discretion of the official in the field'" (quoting *Camara*, 387 U.S. at 532 (footnote omitted)); *United States v. Brignoni–Ponce*, 422 U.S. 873, 882 (1975) ("[T]he reasonableness requirement of the Fourth Amendment demands something more than the broad and unlimited discretion sought by the Government"). Here, there is no evidence that the officers acted based on neutral guiding standards or principles.

In short, by grafting special needs principles onto the exigent circumstances doctrine, the majority has broadened the latter in an unjustified and impractical way. The two exceptions are fundamentally distinct, animated by different objectives, and applied in different contexts.

31

Because this case does not fall within the special needs exception, we must analyze it under the narrowly construed exigent circumstances doctrine. Doing so presents a challenge, as the exigent circumstances exception typically applies to the warrantless entry of a home, not the suspicionless seizure of a person. *See, e.g., Michigan v. Fisher*, 558 U.S. 45, 48 (2009) (exigent circumstances allowed warrantless entry into home to provide emergency assistance); *Santana*, 427 U.S. at 38 (exigent circumstances allowed warrantless entry into home when police were in "hot pursuit" of fleeing suspect); *Turner*, 650 F.2d at 526 (exigent circumstances justified warrantless entry into residence to protect against imminent destruction of evidence).

While some of the abstract principles articulated in these home entry cases may be relevant to our inquiry, we have little guidance on when and how the exigent circumstances exception may apply to a suspicionless investigatory seizure. But the few cases in which courts *have* extended the exigent circumstances exception to investigatory seizures involve specific and clear limiting principles that were not present in Curry's stop. In these cases, officers typically search for a suspect implicated in a known crime in the immediate aftermath of that crime. Pursuant to that objective, they isolate a geographic area with clear boundaries or a discrete group of people to engage in minimally intrusive seizures.

One line of cases applying the exigent circumstances exception to suspicionless seizures involves law enforcement officers establishing vehicular checkpoints along routes

that they reasonably expect will be used by suspects leaving the scene of a known crime.[4]

For example, in *United States v. Harper*, after officers observed a docked boat holding illicit drugs, an agent stationed his car close to the "only paved road with access to the [landing area]." 617 F.2d 35, 40 (1980). In holding that a suspicionless stop resulting from the checkpoint was constitutional, we noted that "[t]he purpose of these stops was to arrest suspects for a known crime, not to discover evidence of undetected crimes by happenstance of visual searches." *Id.* Officers' observation of the crime, the suspects, and the likely escape route allowed them to narrowly target individuals "known to be fleeing the scene along a route reasonably expected to be used for their escape."[5] *Id.*; *see also United States v. Paetsch*, 782 F.3d 1162, 1170–71 (10th Cir. 2015) (holding police barricade at intersection and search of 20 cars without individualized suspicion was "appropriately tailored" because GPS tracker showed that "the stolen money (and likely the armed criminal who stole it) sat in a car idling at that very intersection").

---

[4] In these cases, the vehicular checkpoints were established as an emergency means of preventing or combatting an ongoing crime. Because they were conducted as part of ordinary crime control efforts, they were not analyzed under the special needs exception.

[5] The majority characterizes *Harper* as a case in which suspicionless seizures were based on "exigent circumstances beyond the normal need for law enforcement," again conflating the exigent circumstances and special needs inquiries. But *Harper* frames the suspicionless seizures in that case as "reasonable law enforcement activities" conducted with the "purpose of . . . arrest[ing] suspects for a known crime." *Harper*, 617 F.2d at 40–41. Accordingly, the Court did not base its reasoning on the special needs exception, but on the "exigency of fleeing, perhaps dangerous, suspects . . . found on a likely access route to the scene of the crime." *Id.* at 41.

Beyond the context of vehicular checkpoints, courts have similarly required that officers have specific information about the crime and suspect before engaging in suspicionless seizures. In *Palacios v. Burge*, 589 F.3d 556, 563 (2d Cir. 2009), the Second Circuit considered whether the exigent circumstances exception applied to the detention of a group of people in a club without particularized suspicion as to any one of the individuals. *Id*. Officers surveilling a night club had encountered a man who told them that his brother had been stabbed and that the assailants had run into the club. *Id*. at 559. Moments earlier, the officers had seen a group of men matching the description of the assailants enter the club. *Id*. The officers sealed the exits to the club, detained all the individuals inside, and lined up approximately 170 men who matched the description of the suspect. *Id*. The Second Circuit held that this detention and show-up was not unreasonable because "police knew that the perpetrators were within the finite group of men . . . inside or lined up outside of the . . . [c]lub." *Id*. at 563. Moreover, police feared that witnesses on the scene who could identify the suspect would not be available at a later time. *Id*.

In both the vehicular checkpoint cases and in *Palacios*, officers had specific information about the suspect and the alleged crime that allowed them to narrowly confine their suspicionless seizures. The officers who stopped Curry had no such information. Unlike the officer in *Harper*, who stationed his car along the only escape route from the site of an observed crime, here the officers approached Curry in an open field, at one of several possible escape routes, in an area they only *suspected* to be the scene of an *unknown* crime. *See* 617 F.2d at 40. Likewise, the officers lacked a description of the suspect's appearance or any indication that he was in the vicinity—factors that were central to the

34

court's analysis in *Paetsch*, 782 F.3d at 1168. And unlike the officers in *Palacios*, who were virtually certain that those responsible for a known crime were in an immediately discernible and discrete location, officers here had no reason to believe that the men walking in the field had anything to do with the gunshots they heard. *See* 589 F.3d at 563. Indeed, the fact that the officers stopped those walking in the field but did not stop those standing closer to the apartment complex illustrates the relatively unrestricted nature of the search.

In short, the exigent circumstances exception may permit suspicionless seizures when officers can narrowly target the seizures based on specific information on a known crime and a controlled geographic area. This reading of the exception does not transform it into individualized suspicion by another name. After all, officers in *Harper* and *Palacios* had no particularized suspicion as to any individual they seized. Nor does it require that officers are virtually certain that one of the individuals they stop is the suspect. But officers must support their "objectively reasonable belief" that there is an emergency with "specific articulable facts and reasonable inferences." *See Yengel*, 711 F.3d at 397. And allowing officers to bypass the individualized suspicion requirement based on the information they had here—the sound of gunfire and the general location where it may have originated—completely cripples a fundamental Fourth Amendment protection and creates a dangerous precedent. Lest we forget, the exigent circumstances exception most often applies to warrantless entries into the home. By the majority's logic, police may not only indiscriminately stop individuals within earshot of what they perceive to be gunfire, they

35

may also enter homes in the general vicinity. Such license goes far beyond the intended purpose and scope of the exigent circumstances exception.

A final point bears mentioning. The majority frames the scene officers faced as an "active shooter situation" and points to the Supreme Court's suggestion in *Edmond* that certain emergencies may justify a suspicionless law enforcement checkpoint. *See* 531 U.S. at 44. The *Edmond* Court noted in dicta that "the Fourth Amendment would almost certainly permit an *appropriately tailored* roadblock set up to thwart an imminent terrorist attack or to catch a dangerous criminal who is likely to flee by way of a particular route." *Id.* (emphasis added). Setting aside the fact that Curry's seizure was not conducted pursuant to a vehicular checkpoint, as *Edmond* envisioned, the *Edmond* Court acknowledge that officers must have specific knowledge—of an imminent attack, a particular dangerous criminal, or a likely escape route—that would allow them to "appropriately tailor[]" a suspicionless checkpoint. *Id.* The search at issue here was not tailored at all, nor could it have been based on the limited information officers had when approaching the scene. The Supreme Court has long rejected the notion that "possible homicide presents an emergency situation demanding immediate [warrantless] action." *Mincey v. Arizona,* 437 U.S. 385, 392 (1978). "Moreover, the mere fact that law enforcement may be made more efficient can never by itself justify disregard of the Fourth Amendment." *Id.* Rather, the majority's reasoning would imply that the sound of gunshots, or even something that police perceive to be gunshots, in a high-crime area creates an emergency situation and allows police to stop and frisk anyone in the area without individualized suspicion.

I would affirm the district court and hold that the stop at issue here did not fall within the ambit of either the special needs doctrine or the exigent circumstances exception. Therefore, I respectfully dissent.